**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**Case No.: 24-1794**

**ADAM FOUST,**

**Plaintiff/Appellant**

**v.**

**GENERAL MOTORS LLC AND**
**JON DIEWALD,**

**Defendants/Appellees.**

**Nature of Proceeding Below: Discrimination in Employment**

**Court Below: United States District Court for the Eastern District of Michigan**

---

McTavish Law PLC
Attorneys for Plaintiff/Appellant
Christopher A. Chekan (P54969)
Jeffery J. Wawrzyniak (P61818)
41000 Woodward Ave., Suite 350 East
Bloomfield Hills, MI 48304
T: (248) 289-7096
Email: chris@mctavishlaw.com

Ogletree, Deakins, Nash, Smoak & Stewart, PLLC
Attorneys for Defendants/Appellees
Donald C. Bulea (P84895)
34977 Woodward Ave., Suite 300
Birmingham, MI 48009
T: (248) 593-6400
Email: donald.bulea@ogletree.com

**BRIEF OF PLAINTIFF/APPELLANT ADAM FOUST**

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 2

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-1794 Case Name: Adam Foust v. General Motors, LLC, et.a

Name of counsel: Christopher A. Chekan

Pursuant to 6th Cir. R. 26.1, Adam Foust
*Name of Party*
makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on 3 December 2024 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Christopher A. Chekan
McTavish Law PLC, 41000 Woodward A
Bloomfield Hills, MI 48304

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 3

## III. TABLE OF CONTENTS


V. **STATEMENT IN SUPPORT OF ORAL ARGUMENT** p. 1

VI. **STATEMENT OF JURISDICTION** p. 2

VII. **STATEMENT OF ISSUES** p. 3

VIII. **STATEMENT OF THE CASE** pp. 3-5

IX. **SUMMARY OF ARGUMENT** pp. 5-6

X. **ARGUMENT** pp. 6-17

A. **Standard of Review** pp. 6-7

B. **Foust Does Not Have to Plead Facts of "Background Circumstances" in Order to State a Claim under Title VII** pp. 7-14

C. **The "Background Circumstances" Requirement Should Be Overruled** pp. 15-17

XI. **CONCLUSION** pp. 18-19

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 4

## IV. TABLE OF AUTHORITIES

### Cases

*Ames v. Ohio*, 87 F. 4th 822 (6th Cir. 2023) pp. 1, 16-17.

*Ames v. Ohio Dep't of Youth Servs.*, 2024 U.S LEXIS 3065 (U.S. Oct. 4, 2024) p. 2.

*Ashcroft v. Iqbal*, 556 U.S. 662; 129 S. Ct. 1937; 173 L. Ed 2d 868 (2009) p. 9.

*Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544; 127 S. Ct. 1955; 167 L. Ed 2d 929 (2007) p. 9.

*Bostock v. Clayton Cnty.*, 590 U.S. 644; 140 S. Ct. 1731; 207 L. Ed. 2d 218 (2020) p. 15.

*Donaldson v. DeJoy*, No. 22-1651, 2024 U.S. App. LEXIS 10640; 2024 WL 3493870 (6th Cir. May 1, 2024) pp. 1, 11.

*Donaldson v. DeJoy*, 2024 U.S. App. LEXIS 20567 (6th Cir. Aug. 14, 2024) p. 1.

*E.E.O.C. v. J.H. Routh Packing Co.*, 246 F.3d 850 (6th Cir. 2001) pp. 6-7.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792; 93 S. Ct. 1817; 36 L. Ed 2d 668 (1973) p. 5.

*Milner v. Biggs*, No. 12-3526, 522 Fed. Appx. 287 (6th Cir. Apr. 1, 2013) p. 7.

*Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63 (6th Cir. 1985) pp. 9-10.

*Smyer v. Kroger Ltd., P'ship I*, No. 22-3692, 2024 U.S. App. LEXIS 5717; 2024 WL 1007116 (6th Cir. Mar. 8, 2024) pp. 1, 9, 12-13, 16-17.

*Smyer v. Kroger Ltd. P'ship I*, 2024 U.S. App. LEXIS 9156 (6th Cir. Apr. 15, 2024) p. 1.

*Students for Fair Admission v. President & Fellows of Harvard College*, 600 U.S. 181; 143 S. Ct. 2141; 216 L. Ed 2d 857 (2023) p. 9.

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 5

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508; 122 S. Ct 992; 152 L. Ed. 2d 1, (2002) pp. 7-9, 12.

**Statutes**

28 U.S.C. § 1291 p. 2.

42 U.S.C. § 2000e-2(a)(1) p. 15.

*Bullard-Plawecki Employee Right to Know Act,* MCL 423.501 p.13.

**Other Authorities**

*Federal* Civil Judicial Procedure and Rules, Federal Rules of Civil Procedure, 76-77, Rule 8. General Rules of Pleading, ADVISORY COMMITTEE NOTES, (2024 Revised Edition) pp. 8-9.

Christian Joshua Myers, The Confusion of McDonnell Douglas: A Path Forward for Reverse Discrimination Claims, 44 Seattle University Law Review 1065 (2021) pp. 10-13, 16-17.

Francis J. Vaas, Title VII: Legislative History, 7 Boston College Industrial and Commercial Law Review 431 (1966) pp. 10-11, 16.

Janice C. Whiteside, Title VII and Reverse Discrimination: The Prima Facie Case, 31 Indiana Law Review 413 (1998) pp. 11, 16-17.

## V. STATEMENT IN SUPPORT OF ORAL ARGUMENT

Foust's appeal requests this Court overrule its requirement that a Title VII majority-group plaintiff must plead facts of background circumstances to support the suspicion that defendant is that unusual employer who discriminates against the majority in order to state a claim, ("background circumstances"). *Donaldson v. DeJoy*, No. 22-1651, 2024 U.S. App. LEXIS 10640* at *10; 2024 WL 3493870 (6th Cir. May 1, 2024) (quotations & citations omitted); Rehearing denied by, En banc *Donaldson v. DeJoy*, 2024 U.S. App. LEXIS 20567 (6th Cir. Aug. 14, 2024).

Judge Boggs of this Court has called for that requirement to be overruled. *Smyer v. Kroger Ltd., P'ship I,* No. 22-3692, 2024 U.S. App. LEXIS 5717* at *18; 2024 WL 1007116 (6th Cir. Mar. 8, 2024) (Boggs J., concurring); Rehearing denied by, En banc *Smyer v. Kroger Ltd. P'ship I,* 2024 U.S. App. LEXIS 9156 (6th Cir. Apr. 15, 2024).

Judge Readler of this Court has said that requirement's days are numbered. *Smyer v. Kroger Ltd., P'ship I,* 2024 U.S. App. LEXIS 5717* at *28 (Readler J., concurring).

And Judge Kethledge of this Court has said that requirement is a "deep scratch across the surface of Title VII and perhaps the Supreme Court will review… [it]." *Ames v. Ohio*, 87 F. 4th 822, 827 (6th Cir. 2023) (quotations & citations omitted) (Kethledge J., concurring). The Supreme Court has decided to do

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 7

so. On 4 October 2024, it granted Ames's petition for certiorari. *Ames v. Ohio Dep't of Youth Servs.,* 2024 U.S LEXIS 3065 (U.S. Oct. 4, 2024). The Supreme Court has now scheduled oral argument for 26 February 2025.

In light of the opinions of Judge Boggs, Judge Readler, and Judge Kethledge, and the decision of the Supreme Court, this Court should hold oral argument to decide whether to overrule its "background circumstances" requirement. [1]

## VI. STATEMENT OF JURISDICTION

This Court has jurisdiction of Foust's appeal under 28 U.S.C. § 1291. His appeal is from a final decision of a district court, namely, dismissal of his Title VII claim with prejudice because he did not plead "background circumstances." FRAP 28(a)(4)(B).

Foust's appeal is timely. The district court issued and entered its final decision on 19 August 2024.

Foust filed his Notice of Appeal on 18 September 2024. FRAP 28(a)(4)(C).

Foust's appeal is from a final order. FRAP 28(a)(4)(D).

---

[1] On 2 January 2025, when the appellee's brief is due, Foust intends to petition this Court that his appeal be heard initially en banc: FRAP 35(c).

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 8

## VII. STATEMENT OF ISSUES

Must a Title VII majority-group plaintiff plead facts of background circumstances to support the suspicion that defendant is that unusual employer who discriminates against the majority in order to state a claim.

## VIII. STATEMENT OF THE CASE

Foust was an exceptional employee for GM for 18 years. (Amended Complaint, RE 4, PageID # 23). He rose through the ranks to become Senior Human Resources Manager for Global Design. (*Id.,* PageID ## 23-24). Foust's colleagues at GM remarked that: "Adam has high integrity" (Response to Motion for Judgment on the Pleadings, RE 8-1, PageID # 225 ); "He lives the GM behaviors in an authentic way" (*Id.*, PageID # 227); "I have witnessed Adam display the best of our company values" (*Id.*); "Adam is a strong and inclusive leader" (*Id.,* PageID # 229); He "[h]as a relentless desire to win and does it with integrity" (*Id.* PageID # 226); One of Adam's Managers stated that "Adam is a high performing, executive potential talent in a new demanding assignment." (*Id.*, PageID # 228).

Foust and Kristine Spadine, a female coworker, each drove a GM company vehicle. Both vehicles were subject to the same GM U.S. Company Vehicle Policies. Foust and Spadine violated those policies when Spadine allowed Foust to borrow her GM company vehicle to drive it to Indiana for the weekend to visit his

wife and children who were there on vacation because he possessed two GM company vehicles at the same time. He had Spadine's GM company vehicle, and his wife had his. (Amended Complaint, RE 4, PageID ## 24-25).

GM investigated Foust, but not Spadine, for violating GM's U.S. Company Vehicle Policies. GM fired Foust, but not Spadine, for violating those polices. GM gave Spadine a slap on the wrist. GM told her not do it again and let her keep her job. Spadine is still employed with GM today. GM replaced Foust with a woman, Brittany Palubski. (Amended Complaint, RE 4, PageID ## 24-25).

To justify its discrimination against Foust, GM said that Foust had lied to GM Executive Mike McBride when Foust told McBride that Foust's GM company vehicle was in the shop for tires and an oil change when his wife had his GM company vehicle in Indiana. Foust never lied to McBride and McBride never said Foust lied to him. (Amended Complaint, RE 4, PageID ## 24-25); (Answer to Amended Complaint, RE 5-4, PageID ## 124-125); (Response to Motion for Judgment on the Pleadings, RE 8-1, PageID #231, ## 236-237).

On 12 December 2023, Foust filed a complaint and jury demand. (RE 1).

On 28 January 2024, Foust filed an amended complaint and jury demand. (RE 4).

On 12 February 2024, GM and Diewald filed their answer and affirmative defenses, and their motion for judgment on the pleadings. (RE 5 & RE 7).

On 4 March 2024, Foust filed his response to that motion. (RE 9).

On 18 March 2024, GM and Diewald filed their reply for their motion. (RE 10).

On 19 August 2024, the district court issued and entered an order and judgment that dismissed Foust's Title VII claim with prejudice because he did not plead "background circumstances." (RE 14 & RE 15).

Foust's appeal asks this Court to overrule its requirement that a Title VII majority-group plaintiff must plead facts of background circumstances to support the suspicion that defendant is that unusual employer who discriminates against the majority in order to state a claim.

## IX. SUMMARY OF ARGUMENT

The Supreme Court has unanimously held that a plaintiff does not have to plead facts to establish a prima facie case under the burden-shifting evidentiary framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792; 93 S. Ct. 1817; 36 L. Ed 2d 668 (1973) in order to state a claim for employment discrimination under Title VII.

The Supreme Court's holding applies equally to a Title VII majority-group plaintiff, like Foust.

This Court's "background circumstances" requirement is part of its *McDonnell Douglas* prima facie case burden-shifting evidentiary framework.

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 11

This Court has expanded that requirement from the summary judgment stage to the pleading stage of a proceeding.

Nevertheless, the Supreme Court has said Foust does not have to plead facts of "background circumstances" in order to state a claim under Title VII.

In the alternative, if Foust must plead such facts, then the "background circumstances" requirement should be overruled because it violates the plain text of Title VII, it is contrary to the legislative history of Title VII, it is inherently subjective, and it is discriminatory.

## X. ARGUMENT

### A. Standard of Review

This Court reviews de novo a district court's grant of judgment on the pleadings under Fed. R. Civ. P. 12(c). *E.E.O.C. v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001) (citation omitted).

This Court applies the same standard of review to an order granting a motion to dismiss under Fed. R. Civ. P. 12(b)(6) to an order granting judgment on the pleadings under Fed. R. Civ. P. 12(c). *J.H. Routh Packing Co.*, 246 F.3d at 851 (citation omitted).

This Court "must construe the complaint in the light most favorable to the plaintiff, accept all the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 12

that would entitle relief." *J.H. Routh Packing Co.*, 246 F.3d at 851 (quotation & citation omitted).

This Court continues to apply that standard of review following the Supreme Court's decisions in *Twombly* and. *Iqbal*. *Milner v. Biggs*, No. 12-3526, 522 Fed. Appx. 287, 291 (6th Cir. Apr. 1, 2013) (citations omitted).

### B. Foust Does Not Have to Plead Facts of "Background Circumstances" in Order to State a Claim under Title VII

In *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508; 122 S. Ct 992; 152 L. Ed. 2d 1, (2002), the Supreme Court was presented with the question "whether a complaint in an employment discrimination lawsuit must contain specific facts establishing a prima facie case of discrimination under the framework set forth by this court in *McDonnell Douglas*…".

The Supreme Court unanimously held that such a complaint "… need not include such facts." Instead, it "…must contain only a short plain statement of the claim showing the pleader is entitled to relief. Fed. R. Civ. Proc. 8(a)(2)." *Swierkiewicz,* 534 U.S. at 508.

The Supreme Court gave the following reasons for its holding. Firstly, the prima facie case of discrimination framework is an evidentiary standard not a pleading requirement. *Swierkiewicz,* 534 U.S. at 510 (citation omitted). The framework is "…concerned … [with] the order and allocation *of proof* in a private,

non-class action challenging employment discrimination." *Id.* (quotation & citation omitted) (emphasis in the original).

Secondly, it is incongruent to require a Title VII plaintiff to plead such facts when not every claim of employment discrimination involves circumstantial evidence. Such facts are irrelevant to a claim of employment discrimination based on direct evidence. Moreover, the "precise requirements of a prima facie case can vary depending on the context and were never intended to be rigid, mechanized, or ritualistic." *Id.* at 511-512 (quotation & citation omitted). Because the "prima facie case operates as a flexible standard, it should not be turned into a rigid pleading standard for discrimination cases." *Id.* at 512.

Thirdly, requiring a Title VII plaintiff to plead facts to establish the prima facie case imposes a heightened pleading standard in employment discrimination cases that is not required by the liberal notice pleading of Fed. R. Civ. Pro. 8(a)(2). *Swierkiewicz,* 534 U.S. at 513-514 (quotations & citations omitted). If a heightened pleading standard for employment discrimination cases is to be added to that sub-sub rule, then it must be accomplished through the process of amending the Federal Rules of Civil Procedure. *Id.* at 515 (quotations & citations omitted). That has not happened. The version of Fed. R. Civ. Pro. 8(a)(2) the Supreme Court interpreted in *Swierkiewicz* is the same version today. *Federal* Civil Judicial

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 14

Procedure and Rules, Federal Rules of Civil Procedure, 76-77, Rule 8. General Rules of Pleading, ADVISORY COMMITTEE NOTES, (2024 Revised Edition).

The Supreme Court did not resile from its holding or ratio decidendi in *Swierkiewicz* in either *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544; 127 S. Ct. 1955; 167 L. Ed 2d 929 (2007) or in *Ashcroft v. Iqbal*, 556 U.S. 662; 129 S. Ct. 1937; 173 L. Ed 2d 868 (2009).

In *Twombly,* the Supreme Court reaffirmed its holding and ratio decidendi in *Swierkiewicz. Twombly*, 550 U.S. at 569-570 (quotations & citations omitted).

In *Iqbal*, the Supreme Court did not mention *Swierkiewicz. Iqbal*, 556 U.S. 662.

The Supreme Court's holding and ratio decidendi in *Swierkiewicz* apply to a Title VII majority-group plaintiff. *Swierkiewicz, supra; Twombly, supra; Iqbal, supra.*

In *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 66-68 (6th Cir. 1985), this Court held a Title VII majority-group plaintiff[2] must adduce evidence

[2] What is a majority-group, and who is a member of it, is unclear and becoming more so in the increasingly multi-cultural America. *Students for Fair Admission v. President & Fellows of Harvard College*, 600 U.S. 181, 290-294; 143 S. Ct. 2141; 216 L. Ed 2d 857 (2023) (quotations & citations omitted) (Gorsuch J., concurring); *Smyer v. Kroger Ltd., P'ship I*, 2024 U.S. App. LEXIS 5717* at *19-*21 (quotations & citations omitted) (Boggs J., concurring). Courts should not use incoherent terms to determine whether an individual has suffered discrimination at the hands of his employer.

of background circumstances to support the suspicion that defendant is that unusual employer who discriminates against the majority in order to establish a prima facie case of discrimination under the burden-shifting evidentiary framework in *McDonnell Douglas* in order to avoid summary judgment.

This Court has held such evidence is: "(1) the final decision-maker is …[a member of a minority-group]"; (2) an employer unlawfully considered a prohibited characteristic of an employee, for example sex, in past decisions to the detriment of men, including through questionable affirmative action practices; (3) "a statistical comparison showing a disparity between specific positions within an employer's workforce and the qualified labor pool"; and (4) "… ongoing … tension [between the sexes, for example,] in the workplace." Christian Joshua Myers, The Confusion of McDonnell Douglas: A Path Forward for Reverse Discrimination Claims, 44 Seattle University Law Review 1065, 1103 (2021).

*Murray's* "background circumstances" rule is not based on the plain language of Title VII or its legislative history. *Murray*, 770 F.2d at 66-68 (quotations & citations omitted). Instead, it is based on "… this nation's history of discrimination against racial minorities…". *Id.* at 67 (citations omitted).

In enacting Title VII, Congress stated Title VII is not special legislation exclusively for minorities. Instead, Title VII protects all individual Americans. Francis J. Vaas, Title VII: Legislative History, 7 Boston College Industrial and

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 16

Commercial Law Review 431, 433-434, 436, 438-443, 448-450, 456-458 (1966); Myers, *supra* at 1075, 1077-1081; Janice C. Whiteside, Title VII and Reverse Discrimination: The Prima Facie Case, 31 Indiana Law Review 413, 415-416 (1998).

The Supreme Court has confirmed that Title VII protects all individual Americans. Meyers, *supra* at 1088-1094; Whiteside, *supra* at 415-416.

"The focus of anti-discrimination legislation is equality of opportunity rather equality of result. A history of discrimination by the defendant employer is not important to the question of discrimination in the present case. Similarly, the historical patterns of discrimination in society are not pertinent to whether it has occurred in a particular case." Whiteside, *supra* at 443; *See also* Meyers, *supra* at 1120 n. 471 ("Title VII's core premise should be framed as evaluating cases *individually* to uncover unlawful discrimination") (emphasis in the original).

This Court has expanded its "background circumstances" requirement from the summary judgment stage to the pleading stage of a proceeding. *Donaldson,* 2024 U.S. App. LEXIS 10640* at *10 (quotation & citations omitted).

This Court, and district courts within its jurisdiction, have justified that expansion by saying it does not impose a heightened pleading standard and it is being used to determine the plausibility of Title VII claim. (Order Granting

Defendants' Motion for Judgment on the Pleadings and Denying Plaintiff's Motion to Amend, RE 14, PageID ## 353-354).

With all due respect, neither reason holds water.

The Supreme Court's unanimous pronouncement in *Swierkiewicz* is clear and unequivocal: a plaintiff, including a Title VII majority-group plaintiff, is not required to plead facts of a prima facie case of discrimination under the *McDonnell Douglas* burden shifting evidentiary framework in order to survive a motion to dismiss. "*McDonnell Douglas* is primarily concerned with the presentation of evidence *after* the motion to dismiss stage . . .". Meyers, *supra* at 1082 n. 108 (emphasis added to the original).

Moreover, the Supreme Court in *Swierkiewicz* stated that requiring a plaintiff to plead such facts imposes a heightened pleading standard in contravention of Fed. R. Civ. Pro. 8(a)(2). *Swierkiewicz,* 534 U.S. at 513-515 (quotations & citations omitted).

As Judge Boggs recently stated "[s]uch a requirement does raise the bar for the prospective reverse discrimination plaintiff, notwithstanding the denial of this limitation" by courts that have adopted the rule. *Smyer*, 2024 U.S. App. LEXIS 5717* at *19 (internal quotations & citation omitted) (Boggs J., concurring); *See also* Meyer, *supra* at 1112 (the burden on a Title VII majority-group plaintiff is clearly higher than on a minority-group Title VII plaintiff). "And that higher bar

cannot be squared with Title VII's core inquiry of whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." *Smyer*, 2024 U.S. App. LEXIS 5717* at *19 (internal quotations & citations omitted) (Boggs J., concurring).

Furthermore, as a matter of practice, it is impossible in most cases for a Title VII majority-group plaintiff to plead facts of "background circumstances" to avoid a motion to dismiss because discovery has not yet occurred. Absent discovery, such a plaintiff will not have facts at the pleading stage of a proceeding of whether his employer has unlawfully considered sex in past-decisions to the detriment of men, including through questionable affirmative action practices, of statistics that show a disparity between specific positions within an employer's workforce and the qualified labor pool, or of ongoing tension between the sexes in the workplace. Meyers, *supra* at 1112 (a Title VII majority-group plaintiff "... must engage in lengthy discovery of an employer defendant ..." to find evidence of an employer's discrimination).

Here, GM refused to provide Foust with his employment file under Michigan's *Bullard-Plawecki Employee Right to Know Act*, MCL 423.501, *et. seq.*, despite several written requests by his lawyers to GM's in-house counsel, Mike Little, after GM fired Foust. It was not until almost a year later, and after Foust had

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 19

sued GM, that its outside counsel provided Foust's employment file to his lawyers. (Amended Complaint, RE 4, PageID ## 29-30).

Therefore, based on the forgoing facts and law, Foust should not be required to plead facts of "background circumstances" in order to state a claim under Title VII.

The district court dismissed Foust's Title VII claim only because he had failed to plead facts of "background circumstances."

Because Foust should not be required to plead such facts, he has stated a claim for discrimination under Title VII. GM investigated him and fired him for violating its U.S. Company Vehicle Policies, but GM did not investigate or fire Spadine, a female coworker, for violating the same policies. Today, Spadine still works for GM. GM replaced Foust with a woman, Brittany Palubski. GM tried to cover-up its discrimination against Foust by saying he had lied to GM Executive McBride about Foust's GM company vehicle being in the shop for tires and oil change when Foust's wife had it in Indiana. Foust denied he had lied to McBride and McBride never said Foust did. Therefore, a jury should be allowed to decide whether GM discriminated against Foust based on his sex.

**C. The "Background Circumstances" Requirement Should Be Overruled**

The "background circumstances" rule violates the plain text of Title VII, it is not supported by the legislative history of Title VII, it is inherently subjective, and it is discriminatory.

The relevant text of Title VII reads as follows: "It shall be an unlawful employment practice for an employer - (1) to fail or refuse to hire or discharge *any individual*, or otherwise to discriminate against *any individual* with respect to his compensation, terms, conditions, or privileges of employment, because of such *individual's race, color, religion, sex, or national origin* [.]" 42 U.S.C. § 2000e-2(a)(1) (2024) (emphasis added to the original).

The Supreme Court has held a statute is normally to be interpreted in accordance with the ordinary public meaning of its terms at the time it was enacted. "After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives. And we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654-655; 140 S. Ct. 1731; 207 L. Ed. 2d 218 (2020) (citation omitted).

To paraphrase Justice Gorsuch's opinion for the majority in *Bostock*, the ordinary public meaning of the above language of Title VII at the time it was adopted begets an unequivocal rule: a Title VII majority-group plaintiff does not have to plead facts of "background circumstances" in order to state a claim. *See Bostock*, 590 U.S. at 654-659 (quotations, internal quotations, & citations omitted).

Judge Boggs, Judge Readler, and Judge Kethledge all agree the "background circumstances" requirement violates the plain language of Title VII. *Smyer v. Kroger Ltd. P'ship 1*, 2024 U.S. App. LEXIS 5717* at *21-*22 (quotations & citations omitted) (Boggs J., concurring); *Id.* at *25 (Readler J., concurring); and *Ames*, 87 Fed. 4th at 827 (Kethledge J., concurring).

The legislative history of Title VII is silent regarding the "background circumstances" requirement. Moreover, that legislative history explicitly states Title VII applies to all individual Americans regardless of an individual's race, color, religion, sex, or national origin." Vaas, Title VII: Legislative History, at 433-434, 436, 438-443, 448-450, 456-458; Meyers, The Confusion of McDonnell Douglas: A Path Forward for Reverse Discrimination Claims, at 1075, 1077-1081; and Whiteside, Title VII and Reverse Discrimination: The Prima Facie Case, at 415-416.

"The background circumstances test currently depends on the personal and societal judgments that unquestionably vary from judge to judge…". Meyers,

*supra* at 1121. … "[T]he background circumstances test . . . invariably depends on a judge's background and beliefs." *Id.* "The background circumstances test thus abandons objectivity since it relies upon judges' subjective intuitions." *Id.*

Judge Boggs, Judge Readler, and Judge Kethledge all agree also the "background circumstances" requirement is discriminatory because it treats some "individuals" worse than others in contravention of the express language of Title VII. *Smyer v. Kroger Ltd. P'ship 1*, 2024 U.S. App. LEXIS 5717* at *19, *22-*23 (quotations & citations omitted) (Boggs J., concurring); *Id.* at *27 (quotations & citations omitted) (Readler J., concurring); *Ames,* 87 Fed. 4th at 827 (Kethledge J., concurring); and Whiteside, *supra* at 443 ("The focus of Title VII is upon discrimination against *individuals* not groups") (emphasis added to the original).

Therefore, based on the forgoing law, this Court should overrule its requirement that a Title VII majority-group plaintiff must plead facts of background circumstances to support the suspicion that defendant is that unusual employer who discriminates against the majority in order to state a claim.

## XI. CONCLUSION

Based on the forgoing facts and law, Foust requests the following relief from this Court:

A. Vacate the order and judgment of the district court, dated 19 August 2024, that dismissed Foust's Title VII claim with prejudice and denied his motion to amend his First Amended Complaint and Jury Demand with his proposed Second Amended Complaint and Jury Demand as futile because his Title VII claim in his proposed Second Amended Complaint and Jury Demand did not plead facts of "background circumstances";

B. Find that a Title VII majority-group plaintiff, like Foust, does not have to plead facts of background circumstances to support the suspicion that defendant is that unusual employer who discriminates against the majority in order to state a claim;

C. Overrule that "background circumstances" requirement;

D. Reinstate Foust's First Amended Complaint and Jury Demand;

E. Grant Foust thirty days from the date this case is remanded to the district court to serve and file a motion to amend his First Amended Complaint and Jury Demand with his proposed Second Amended Complaint and Jury Demand;

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 24

F. Award Foust his costs of his appeal; and,

G. Such further and other relief that Foust may request, and this Court deems just.

Dated: 3 December 2024

/s/ Christopher A. Chekan
McTavish Law PLC
Attorneys for Plaintiff/Appellant
Christopher A. Chekan (P54969)
Jeffrey J. Wawrzyniak (P61818)
41000 Woodward Ave. Suite 350 East
Bloomfield Hills, MI 48304
T: (248) 289-7096
Email: **chris@mavtavishlaw.com**

**Form 6. Certificate of Compliance With Type-Volume Limit**

Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1. This document complies with [the type-volume limit of Fed. R. App. P. [ 32(a)(7)(B)(i) ]] [the word limit of Fed. R. App. P. [ 32(a)(7)(B)(i) because it contains less than 13,000 words. ]] because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) [and [ not applicable ]]:

   ☑ this document contains 3,897 words, or

   ☐ this brief uses a monospaced typeface and contains ________ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

   ☑ this document has been prepared in a proportionally spaced typeface using Times New Roman 14 point in
   ________________________, or

   ☐ this document has been prepared in a monospaced typeface using
   ________________________ with
   ________________________.

/s/ Christopher A. Chekan

Attorney for Plaintiff/Appellant, Adam Foust

Dated: 12/3/2024

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 26

## XIII. CERTIFICATE OF SERVICE

I, Christopher A. Chekan, counsel for the plaintiff/appellant, Adam Foust, hereby certify that on 3 December 2024 I electronically filed his brief with the clerk of this Court pursuant to the ECF system, which will provide that brief to counsel for the defendants/appellees.

/s/ Christopher A. Chekan

McTavish Law PLC
Attorneys for Plaintiff/Appellant
Christopher A. Chekan (P54969)
Jeffrey J. Wawrzyniak (P61818)
41000 Woodward Ave. Suite 350 East
Bloomfield Hills, MI 48304
T: (248) 289-7096
Email: **chris@mavtavishlaw.com**

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 27

## XIV. ADDENDUM

## APPELLANT'S DESIGNATION OF RELEVANT ORIGINATING COURT DOCUMENTS

Amended Complaint, RE 4, PageID ## 19-32.

Answer to Amended Complaint, RE 5, PageID ## 33-49; RE 5-1, PageID # 50; RE 5-2, PageID ## 51-72; RE 5-3, PageID ## 73-122; RE 5-4, PageID ## 123-125; RE 5-5, PageID ## 126-135; RE 5-6, PageID ## 136-138.

Motion for Judgment on the Pleadings, RE 7, PageID ## 140-172.

Response to Motion for Judgment on the Pleadings, RE 8, PageID ## 173-203; RE 8-1, PageID ## 204-239.

Reply for Motion for Judgment on the Pleadings, RE 10, PageID ## 302-309.

Court Order Dismissing Title VII Claim with Prejudice, RE 14, PageID ## 345-362.

Court Judgment Dismissing Title VII Claim with Prejudice, RE 15, PageID ## 365-366.

Notice of Appeal, RE 17, PageID # 368.

## COPIES OF DECISIONS NOT AVAILABLE IN A PUBLICLY ACCESSIBLE ELECTRONIC DATABASE

Tab "A": *Donaldson v. DeJoy,* No. 22-1651, 2024 U.S. App. LEXIS 10640; 2024 WL 3493870 (6th Cir. May 1, 2024)

Tab "B": *Donaldson v. DeJoy,* 2024 U.S. App. LEXIS 20567 (6th Cir. Aug. 14, 2024)

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 28

Tab "C": *Smyer v. Kroger Ltd., P'ship 1*, No. 22-3692, 2024 U.S. App. LEXIS 5717; 2024 WL 1007116 (6th Cir. Mar. 8, 2024)

Tab "D": *Smyer v. Kroger Ltd., P'ship 1*, 2024 U.S. App. LEXIS 9156 (6th Cir. Apr. 15, 2024)

Tab "E": *Ames v. Ohio Dep't of Youth Servs.*, 2024 U.S. LEXIS 3065 (U.S. Oct. 4, 2024)

Tab "F": *Milner v. Biggs,* No. 12-3526, 522 Fed. Appx. 287 (6th Cir. Apr. 1, 2013)

Case: 24-1794    Document: 27    Filed: 01/15/2025    Page: 29

Tab "A"

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 30

Neutral
As of: December 3, 2024 3:23 PM Z

# Donaldson v. DeJoy

United States Court of Appeals for the Sixth Circuit

May 1, 2024, Filed

No. 22-1651

**Reporter**
2024 U.S. App. LEXIS 10640 *; 2024 WL 3493870

MARK P. DONALDSON, Plaintiff-Appellant, v. LOUIS DEJOY, Postmaster General USPS Great Lakes Area; CHARLOTTE A. BURROWS, Defendant-Appellees.

**Notice:** CONSULT *6TH CIR. R. 32.1* FOR CITATION OF UNPUBLISHED OPINIONS AND DECISIONS.

**Subsequent History:** Rehearing denied by, En banc *Donaldson v. DeJoy, 2024 U.S. App. LEXIS 20567 (6th Cir., Aug. 14, 2024)*

**Prior History:** [*1] ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN.

*Donaldson v. DeJoy, 2022 U.S. Dist. LEXIS 50526, 2022 WL 834005 ( E.D. Mich., Mar. 21, 2022)*
*Donaldson v. DeJoy, 2022 U.S. Dist. LEXIS 93948, 2022 WL 1670105 ( E.D. Mich., May 25, 2022)*

## Core Terms

district court, discovery, motion to dismiss, retaliation, orientation, second amended complaint, first amended complaint, protected activity, terminated, allegations, coworker, failure to state a claim, lodging, amend, motion for leave, national origin, undue delay, discriminated, backing, mailbox, sex

## Case Summary

**Overview**
HOLDINGS: [1]-The district court properly dismissed the appellant's disparate-treatment discrimination claim for failure to state a claim under *Fed. R. Civ. P. 12(b)(6)* because he failed to allege facts to support a plausible explanation for how he was discriminated against based on his race, age, national origin, or sex since he was white and American. The appellant did not dispute that he had been required to plead sufficient facts showing background circumstances to support the suspicion that the defendant was that unusual employer who discriminated against the majority, but the appellant did not; [2]-The district court did not abuse its discretion in concluding that the appellant brought his motion with undue delay and that granting it would be prejudicial because he was on notice months earlier that his claims were deficiently pleaded.

**Outcome**
Judgment affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Defenses,

Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN1*[⬇] **Standards of Review, De Novo Review**

An appellate court reviews de novo a district court's decision dismissing a complaint for failure to state a claim under *Fed. R. Civ. P. 12(b)(6)*. To survive a motion to dismiss for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. In addressing a motion to dismiss, the district court may consider exhibits attached to the complaint.

Labor & Employment Law > Discrimination > Actionable Discrimination

Labor & Employment Law > ... > Religious Discrimination > Scope & Definitions > Covered Employees & Employers

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

Labor & Employment Law > ... > Religious Discrimination > Burdens of Proof > Employee Burdens

Labor & Employment Law > ... > Disparate Treatment > Evidence > Burdens of Proof

*HN2*[⬇] **Discrimination, Actionable Discrimination**

*Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq.*, and the ADEA prohibit an employer from discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin, *42 U.S.C.S. § 2000e-2(a)(1)*, or because of such individual's age, *29 U.S.C.S. § 623(a)*. At the pleading stage, the plaintiff is not obligated to plead a prima facie case of disparate-treatment discrimination under McDonnell Douglas, which requires that a plaintiff show that he (1) was a member of a protected class, (2) suffered an adverse employment action, (3) was qualified for his position, and (4) was replaced by someone outside the protected class or was treated differently from similarly situated members of the unprotected class. Instead, the plausibility pleading standard of *Fed. R. Civ. P. 12(b)(6)* applies.

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Evidence > Inferences & Presumptions > Inferences

*HN3*[⬇] **Complaints, Requirements for Complaint**

Broad and conclusory allegations of discrimination cannot be the basis of a complaint and a plaintiff must state allegations that plausibly give rise to the inference that a defendant acted as the plaintiff claims.

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 32

*HN4*[⬇] **Complaints, Requirements for Complaint**

Factual allegations about discriminatory conduct that are based on nothing more than a plaintiff's belief are naked assertions devoid of further factual enhancement that are insufficient to state a claim.

Labor & Employment Law > ... > Age Discrimination > Evidence > Circumstantial Evidence

Labor & Employment Law > ... > Age Discrimination > Discriminatory Employment Practices > Discharges & Failures to Hire

*HN5*[⬇] **Evidence, Circumstantial Evidence**

Being fired by a younger manager is insufficient by itself to support a finding of age discrimination.

Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof

*HN6*[⬇] **Retaliation, Burdens of Proof**

To establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in protected activity; (2) the defendant had knowledge of his protected activity; (3) the defendant thereafter took an adverse employment action against him; and (4) there was a causal connection between the protected activity and the adverse employment action.

Labor & Employment Law > ... > Retaliation > Elements > Protected Activities

*HN7*[⬇] **Elements, Protected Activities**

An employee may show that he engaged in protected activity for purposes of *Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq.*, by alleging conduct that falls within one of two clauses in the statute, which provides that it is an unlawful employment practice for an employer to discriminate against any of his employees: 1. because the employee has opposed any practice made an unlawful employment practice by this subchapter, or 2. because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. *42 U.S.C.S. § 2000e-3(a)*. The first clause is known as the opposition clause, and the second as the participation clause.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

*HN8*[⬇] **Standards of Review, Abuse of Discretion**

An appellate court reviews decisions limiting or denying discovery for an abuse of discretion. A district court does not abuse its discretion in denying discovery when the discovery requested would be irrelevant to the underlying issue to be decided. Limitations on pretrial discovery are appropriate where claims may be dismissed based on legal determinations that could not have been altered by any further discovery.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil

Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

HN9[] **Standards of Review, Abuse of Discretion**

An appellate court reviews a denial of leave to amend a complaint based on undue delay for abuse of discretion, but the court reviews de novo the legal conclusion that amendment would be futile because a proposed amended complaint fails to state a claim.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

HN10[] **Amendment of Pleadings, Leave of Court**

Delay by itself is a sufficient basis on which to deny a motion to amend when the delay becomes undue, placing an unwarranted burden on the court, or becomes prejudicial, placing an unfair burden on the opposing party. Although delay by itself is not sufficient to deny a motion to amend, it may be when combined with the prejudice.

**Counsel:** MARK P. DONALDSON, Plaintiff - Appellant, Pro se, Roscommon, MI.

For LOUIS DEJOY, Postmaster General USPS Great Lakes Area, CHARLOTTE A. BURROWS, Defendants - Appellees: Christopher J. Doyle, Assistant U.S. Attorney, Office of the U.S. Attorney, Detroit, MI.

**Judges:** Before: BOGGS, MOORE, and MURPHY, Circuit Judges.

## Opinion

ORDER

In this employment-discrimination action brought under *Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq.*, and the *Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq.*, Mark P. Donaldson, proceeding pro se, appeals the district court's judgment dismissing his first amended complaint and denying his motions for discovery and to file a second amended complaint. This case has been referred to a panel of the court that, upon examination, unanimously agrees that oral argument is not needed. *See Fed. R. App. P. 34(a)*. Because Donaldson did not allege facts that state a claim upon which relief can be granted and has not shown that the district court abused its discretion in any respect, we affirm.

Relevant Factual Background

Donaldson, a white man in his sixties, is a former United States Postal Service (USPS) employee. In July and August 2017, upon being hired as a rural carrier, Donaldson attended an orientation session led **[*2]** by Julia Campbell. According to Donaldson, on the first day of orientation, a coworker, Thomas LeBeau, made a loud "offensive statement about violence [and] hitting [Donaldson] on the head." Donaldson also alleged that, throughout the orientation, Campbell "volunteered numerous inappropriate statements, opinions, and/or actions," including a story about a male coworker who called her "beautiful," which she perceived to be a "sexual innuendo" in light of his eye contact with her at the time. Campbell allegedly later overheard Donaldson tell another coworker that Campbell "didn't handle the harassment thing correctly."

During the orientation, Donaldson and the other attendees were instructed to write "comments and ideas" regarding particular topics on sheets of paper; Donaldson allegedly



Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 33

wrote "mans world" on his paper, and Campbell taped it up on the wall without his permission. At another point during the orientation, Campbell allegedly "scream[ed]" and "point[ed]" at Donaldson and Nick Nitlet, a Hispanic and Nicaraguan coworker; Donaldson alleged that Campbell apologized to Nitlet but not to him.

Roughly one week after orientation, Donaldson shadowed a more experienced coworker, Melissa **[*3]** Andrzejewski. During their route, Andrzejewski allegedly backed the vehicle up to a mailbox, in violation of USPS policy. Donaldson also alleged that, throughout the shadow day, Andrzejewski repeatedly stated that she was "Queen of the Brown Nosers" and that she "was doing her brown nosing for" their supervisor, Barbara Wandrie. Donaldson then complained to Wandrie about Andrzejewski's backing her vehicle up to a mailbox and repeated use of the "Queen of the Brown Nosers" phrase; Wandrie allegedly declined to discuss or investigate the matters.

Just over one week later, Donaldson set out to attend additional training in another city that required travel and lodging. Wandrie gave Donaldson a stipend and informed him that he needed to make his own travel arrangements but that he should stay at the Red Roof Inn. When Donaldson booked a more expensive hotel, Wandrie told him that he might not get reimbursed for it. Donaldson then asked Wandrie to "send [him] asap the complete list of all approved hotels in the . . . area" and asked if the stipend amount that Wandrie quoted him was the maximum reimbursable amount. The next morning, Donaldson called USPS's finance office and requested a copy **[*4]** of the USPS's travel and relocation handbook. Later that day, Donaldson wrote a letter to "Whom It May Concern" at the USPS, stating that he was unable to obtain lodging with the provided stipend and thus would not attend the training and would reschedule for a later date.

Donaldson was terminated the same day. In the termination letter, Wandrie informed Donaldson that his "termination is based on multiple incidents where [he has] demonstrated a less than professional demeanor with [his] co-workers and Management." Wandrie stated that Donaldson had "multiple problems" during orientation, had "berated" Andrzejewski for backing up to a mailbox, and had an "uncooperative attitude" in trying to secure lodging for the training. Wandrie concluded that, based on his attitude, Donaldson would "have difficulty in meeting the expectation the [USPS] has for its employees."

## Procedural History

In 2017, Donaldson filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). After conducting a hearing, an EEOC Administrative Law Judge (ALJ) rendered a decision denying Donaldson's claims; thereafter, the EEOC issued a notice of final action. Donaldson then brought this action, **[*5]** originally naming Louis DeJoy, the Postmaster General for the USPS's Great Lakes Area, as a defendant. He then filed an amended complaint, adding Charlotte Burrows, the chair of the EEOC, as a defendant. His amended complaint raised 18 claims: the first 15 alleged errors by the USPS and the EEOC during the EEOC proceedings, and the last three alleged disparate-treatment discrimination and retaliation based on Donaldson's race, sex, age, and national origin.

The defendants moved to dismiss counts 1-15 under *Federal Rule of Civil Procedure 12(b)(1)* for lack of subject-matter jurisdiction and counts 16-18 under *Rule 12(b)(6)* for failure to state a claim. Over Donaldson's objections, the district court adopted the magistrate judge's



Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 34

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 35

recommendation that the motion to dismiss be granted; it also denied Donaldson's motion requesting discovery. Thereafter, the district court denied Donaldson's motion for leave to file a second amended complaint (which he had filed after the magistrate judge issued the report and recommendation but before the district court adopted it) and motion for reconsideration of its order dismissing his first amended complaint. It entered a judgment dismissing the action. Donaldson then filed a post-judgment motion for **[*6]** reconsideration, which the district court denied.

Donaldson now appeals, challenging the district court's conclusion that his first amended complaint failed to state a claim and its denial of his motions for discovery and for leave to file a second amended complaint.

Motion to Dismiss

*HN1*[↑] We review de novo a district court's decision dismissing a complaint for failure to state a claim under *Rule 12(b)(6)*. *Jama v. Dep't of Homeland Sec., 760 F.3d 490, 494 (6th Cir. 2014)*. To survive a motion to dismiss for failure to state a claim, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly, 550 U.S. at 556*). In addressing a motion to dismiss, the district court may consider exhibits attached to the complaint. *Gavitt v. Born, 835 F.3d 623, 640 (6th Cir. 2016)*.

**Claims 16-18 - Failure to State a Claim**

*Discrimination*

*HN2*[↑] Title VII and the ADEA prohibit an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national **[*7]** origin," *42 U.S.C. § 2000e-2(a)(1)*, or "because of such individual's age," *29 U.S.C. § 623(a)*. The district court correctly noted that at the pleading stage Donaldson was not obligated to plead a prima facie case of disparate-treatment discrimination under *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*, which requires that a plaintiff show that he (1) "was a member of a protected class," (2) "suffered an adverse employment action," (3) "was qualified for his position," and (4) "was replaced by someone outside the protected class or was treated differently" from similarly situated members of the unprotected class. *Blount v. Stanley Eng'g Fastening, 55 F.4th 504, 510 (6th Cir. 2022)*; *see Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)*. Instead, the plausibility pleading standard of *Rule 12(b)(6)* applies. *Swierkiewicz, 534 U.S. at 511*; *see Keys v. Humana, Inc., 684 F.3d 605, 608-09 (6th Cir. 2012)*.

Even applying this liberal pleading standard, we agree with the district court that Donaldson failed to allege facts to support a "plausible explanation for how he was discriminated [against] based on his race, age, national origin, or sex." *See White v. Coventry Health & Life Ins. Co., 680 F. App'x 410, 415-16 (6th Cir. 2017)* (finding "naked assertions" to be "wholly conclusory" and insufficient to state a claim where the plaintiff broadly alleged "that 'almost from the very beginning of [her]

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 36

employment she suffered from harassment, discrimination, intimidation, berating and a hostile work environment,' that she was 'constantly berated' by a supervisor, and that [supervisor] **[*8]** 'degraded and humiliated' her" (citing *Iqbal, 556 U.S. at 678*)). As for sex-based discrimination, the only facts alleged that could conceivably support such a claim and that Donaldson addresses on appeal are that Campbell overheard him criticize her sexual-harassment story and that Andrzejewski was not disciplined despite backing her vehicle toward a mailbox and repeatedly referring to herself as "Queen of the Brown Nosers."

But these facts, as alleged, fall short of stating a sex-discrimination claim. Regarding Donaldson's allegations about Campbell, they at best lead to an inference that Campbell may have disliked Donaldson because he criticized her sexual-harassment story; they do not lead to an inference that Campbell—who was not alleged to have any decisionmaking authority—discriminated against him on the basis of sex. *See Downs v. Bel Brands USA, Inc., 613 F. App'x 515, 519 (6th Cir. 2015)* ("[*HN3*] B]road and conclusory allegations of discrimination cannot be the basis of a complaint" and "a plaintiff must state allegations that plausibly give rise to the inference that a defendant acted as the plaintiff claims." (quoting *HDC, LLC v. City of Ann Arbor, 675 F.3d 608, 614 (6th Cir. 2012)*)).

Regarding Andrzejewski, Donaldson does not allege that he, like she, backed a vehicle up to a mailbox, so any complaints about Andrzejewski failing **[*9]** to be disciplined for that action cannot plausibly show sex discrimination. *Cf. Blount, 55 F.4th at 512* ("In order to be considered similarly situated, employees must have engaged in acts of comparable seriousness." (cleaned up)). The same can be said of Donaldson's complaint that Andrzejewski was not disciplined or terminated for repeatedly using the phrase "Queen of the Brown Nosers." The exhibits attached to Donaldson's first amended complaint show that he—a new employee—was terminated because he made "derogatory comments" in orientation, exhibited a poor professional demeanor, and had an uncooperative attitude when trying to work out the lodging issues—things that Andrzejewski was not alleged to have done. And we cannot plausibly infer that Andrzejewski's use of the phrase "Queen of the Brown Nosers" to describe herself has any underlying discriminatory meaning to Donaldson, sex-based or otherwise.

Donaldson's broad and conclusory allegations that he was discriminated against on account of his race and national origin fare no better. *See Boxill v. O'Grady, 935 F.3d 510, 520 (6th Cir. 2019)*. He alleged generally, with no factual support, that Wandrie and Campbell discriminated against him based on his race and national origin; the only fact-based allegation **[*10]** is that Campbell treated Nitlet, who is Hispanic and Nicaraguan, more favorably by apologizing to him—but not Donaldson—after she screamed and pointed at both of them during orientation. Because he is white and American, Donaldson does not dispute that he was required to plead sufficient facts showing "background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Zambetti v. Cuyahoga Cmty. Coll., 314 F.3d 249, 255 (6th Cir. 2002)* (cleaned up); *see Sutherland v. Mich. Dep't of Treasury, 344 F.3d 603, 614 (6th Cir. 2003)*. But Donaldson did not, and his race discrimination claim is even more implausible in view of his allegation that Campbell is also white. *See Ames v. Ohio Dep't of Youth Servs., 87 F.4th 822, 825 (6th Cir. 2023)* (per curiam).

Finally, regarding Donaldson's age, merely

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 37

alleging that he was over 60 years old and was terminated by a manager who was 46 years old is insufficient to allow an inference of age-based discrimination. *See El-Hallani v. Huntington Nat'l Bank, 623 F. App'x 730, 735 (6th Cir. 2015)* ("[*HN4*[↑]] F]actual allegations about discriminatory conduct that are based on nothing more than a plaintiff's belief are 'naked assertions devoid of further factual enhancement' that are insufficient to state a claim." (quoting *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B., 727 F.3d 502, 506 (6th Cir. 2013)*); *Norton v. Sam's Club, 145 F.3d 114, 119 (2d Cir. 1998)* (explaining that *HN5*[↑] being fired by a younger manager is insufficient by itself to support a finding of age discrimination).

In short, because Donaldson did not **[*11]** allege sufficient facts to support an inference that he was treated differently based on his membership in a protected class, the district court properly dismissed his disparate-treatment discrimination claim for failure to state a claim.

*Retaliation*

Donaldson also challenges the dismissal of his retaliation claim. He alleged that the USPS retaliated against him when it, through Wandrie, failed to investigate Andrzejewski's "Queen of the Brown Nosers" comments, failed to communicate with him regarding the LeBeau physical-threat incident, and terminated him. *HN6*[↑] To establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in protected activity; (2) the defendant had knowledge of his protected activity; (3) the defendant thereafter took an adverse employment action against him; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009)*.

Donaldson was required to plead sufficient facts from which we can plausibly conclude that the USPS retaliated against him because he engaged in a protected activity. *Charlton-Perkins v. Univ. of Cincinnati, 35 F.4th 1053, 1060-61 (6th Cir. 2022)*. *HN7*[↑] An employee may show that he engaged in "protected activity" for purposes of Title VII by alleging conduct that **[*12]** falls within one of two clauses in the statute, which provides that it is an "unlawful employment practice for an employer to discriminate against any of his employees . . . [1] because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or [2] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *42 U.S.C. § 2000e-3(a)*. The first clause is known as the "opposition clause," and the second as the "participation clause." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., 555 U.S. 271, 274, 129 S. Ct. 846, 172 L. Ed. 2d 650 (2009)*.

Donaldson alleged and maintains that he engaged in a protected activity when he (1) contacted USPS's finance office to report his issues with securing lodging for training and (2) told Wandrie about Andrzejewski's "Queen of the Brown Nosers" comment. But reporting lodging issues and telling a superior that a coworker referred to herself as "Queen of the Brown Nosers"—which, as set forth above, cannot plausibly be construed as discriminatory—are not acts of opposition that are covered by Title VII or the ADEA. And the activities do not fall under the participation clause because Donaldson did not allege participation in an internal investigation into **[*13]** allegations of unlawful discrimination that "occur[ed] pursuant to a pending EEOC charge." *Abbott v. Crown Motor Co., 348 F.3d 537, 543 (6th Cir. 2003)*. Thus, based on Donaldson's allegations, we cannot reasonably infer that the USPS

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 38



retaliated against him for engaging in a protected activity. And because retaliation claims require the plaintiff to show that his *protected activity* was a but-for cause of the alleged adverse action, *see* *Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013)*, the district court properly dismissed Donaldson's retaliation claim for failure to state a claim.

Motion for Discovery

Donaldson also challenges the district court's denial of his motion for discovery, in which he sought various materials that purportedly are relevant to his claims, including metadata from his termination letter, emails concerning Wandrie, and documents pertaining to Andrzejewski.

*HN8*[] We review decisions limiting or denying discovery for an abuse of discretion. *Anwar v. Dow Chem. Co., 876 F.3d 841, 854 (6th Cir. 2017)*. "A district court does not abuse its discretion in denying discovery when the discovery requested would be irrelevant to the underlying issue to be decided." *Doe v. City of Memphis, 928 F.3d 481, 490 (6th Cir. 2019)* (quoting *In re Bayer Healthcare & Merial Ltd. Flea Control Prods. Mktg. & Sales Pracs. Litig., 752 F.3d 1065, 1074 (6th Cir. 2014)*).

Here, the district court did not abuse its discretion in denying Donaldson's discovery motion that he filed while the defendants' motion to dismiss was pending because the **[*14]** discovery that he sought was not relevant to whether his first amended complaint stated a plausible claim for relief. *See* *Gettings v. Bldg. Laborers Loc. 310 Fringe Benefits Fund, 349 F.3d 300, 304 (6th Cir. 2003)* ("Limitations on pretrial discovery are appropriate where claims may be dismissed 'based on legal determinations that could not have been altered by any further discovery.'" (quoting *Muzquiz v. W.A. Foote Mem'l Hosp., Inc., 70 F.3d 422, 430 (6th Cir. 1995)*)).

Motion for Leave to File Second Amended Complaint

Finally, Donaldson challenges the denial of his motion for leave to file a second amended complaint on the ground that an amendment would cause undue delay and prejudice and would be futile. *HN9*[] We review a denial of leave to amend a complaint based on undue delay for abuse of discretion, *Doe v. Mich. State Univ., 989 F.3d 418, 426 (6th Cir. 2021)*, but "we review de novo the legal conclusion that amendment would be futile because a proposed amended complaint fails to state a claim," *Linden v. City of Southfield, 75 F.4th 597, 602 (6th Cir. 2023)*.

*HN10*[] The district court did not abuse its discretion in concluding that Donaldson brought his motion with undue delay and that granting it would be prejudicial. *See* *Morse v. McWhorter, 290 F.3d 795, 800 (6th Cir. 2002)* (stating that delay by itself is a sufficient basis on which to deny a motion to amend when the delay "becomes undue, placing an unwarranted burden on the court, or becomes prejudicial, placing an unfair burden on the opposing party" (cleaned up)); *Coe v. Bell, 161 F.3d 320, 342 (6th Cir. 1998)* (holding **[*15]** that, although "delay by itself is not sufficient to deny a motion to amend," it may be "when combined with the prejudice" (cleaned up)). Before filing their motion to dismiss Donaldson's first amended complaint in June 2021—which superseded his original complaint that the defendants had also moved to dismiss—the defendants conferred with him, but Donaldson did not seek leave to amend at that time. Nor did he after receiving the defendants' motion to dismiss. It was not until January 2022—after the magistrate judge

recommended that Donaldson's first amended complaint be dismissed for failure to state a claim—that Donaldson filed a motion for leave to file a second amended complaint. Donaldson's motion to amend sought to add three defendants and "clarif[y] counts involving [his] discrimination . . .[,] retaliation and disparate treatment claims." But he was on notice months earlier that his claims were deficiently pleaded, and allowing an amendment would require the parties to re-brief the defendants' motion to dismiss, resulting in additional delay. Under these circumstances, the district court reasonably concluded that Donaldson was guilty of undue delay and that both it and the defendants **[*16]** would have been prejudiced if he were granted leave to file a second amended complaint while the defendants' motion to dismiss his first amended complaint was ripe for disposition. *See Lamb v. Wilson, No. 17-1670, 2018 U.S. App. LEXIS 1016, 2018 WL 2972441, at *4 (6th Cir. Jan. 16, 2018)* (concluding that the district court did not abuse its discretion in denying the plaintiff's motion to amend his complaint filed after the magistrate judge recommended that the claims remaining in his original complaint be dismissed).

Because the district court did not abuse its discretion in denying Donaldson's motion for leave to file a second amended complaint on the ground that the motion was brought with undue delay and granting it would prejudice the court and the defendants, we need not address whether an amendment would be futile.

For all of the foregoing reasons, we **AFFIRM** the district court's judgment.

---

**End of Document**

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 39

Tab "B"

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 41

Neutral
As of: December 3, 2024 3:24 PM Z

# Donaldson v. DeJoy

United States Court of Appeals for the Sixth Circuit

August 14, 2024, Filed

No. 22-1651

**Reporter**
2024 U.S. App. LEXIS 20567 *

MARK P. DONALDSON, Plaintiff-Appellant, v. LOUIS DEJOY, POSTMASTER GENERAL USPS GREAT LAKES AREA; CHARLOTTE A. BURROWS, Defendants-Appellees.

**Prior History:** *Donaldson v. DeJoy, 2024 U.S. App. LEXIS 10640, 2024 WL 3493870 (6th Cir. Mich., May 1, 2024)*

## Core Terms

petition for rehearing, en banc

**Counsel:** **[*1]** MARK P. DONALDSON, Plaintiff - Appellant, Pro se, Roscommon, MI.

For LOUIS DEJOY, Postmaster General USPS Great Lakes Area, CHARLOTTE A. BURROWS, Defendant - Appellee: Christopher J. Doyle, Assistant U.S. Attorney, Office of the U.S. Attorney, Detroit, MI.

**Judges:** BEFORE: BOGGS, MOORE, and MURPHY, Circuit Judges.

## Opinion

ORDER

The court received a petition for rehearing en banc. The original panel has reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission and decision of the case. The petition then was circulated to the full court.* No judge has requested a vote on the suggestion for rehearing en banc.

Therefore, the petition is denied.

End of Document

* Judge Davis recused herself from participation in this ruling.

Powered by TCPDF (www.tcpdf.org)

Chris Chekan

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 42

LexisNexis®

**User Name:** Chris Chekan
**Date and Time:** Tuesday, December 3, 2024 10:25:00□ AM EST
**Job Number:** 239939909

## Document (1)

1. *Smyer v. Kroger Ltd.. P'ship I, 2024 U.S. App. LEXIS 5717*

**Client/Matter:** -None-

**Search Terms:** Smyer v. Kroger Ltd.. P'ship I, 2024 U.S. App. LEXIS 5717

**Search Type:** Natural Language

**Narrowed by:**

| Content Type | Narrowed by |
|---|---|
| Cases | -None- |

LexisNexis1 About LexisNexis I Privacy Policy I Terms & Conditions I Copyright © 2024 LexisNexis

Chris Chekan

Tab "C"

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 44

Neutral
As of: December 3, 2024 3:25 PM Z

# Smyer v. Kroger Ltd.. P'ship I

United States Court of Appeals for the Sixth Circuit

March 8, 2024, Filed

File Name: 24a0107n.06

No. 22-3692

**Reporter**
2024 U.S. App. LEXIS 5717 *; 2024 FED App. 0107N (6th Cir.); 2024 WL 1007116

MATTHEW SMYER, Plaintiff-Appellant, v. KROGER LIMITED PARTNERSHIP I, et al., Defendants-Appellees.

**Notice:** CONSULT *6TH CIR. R. 32.1* FOR CITATION OF UNPUBLISHED OPINIONS AND DECISIONS.

**Subsequent History:** Rehearing denied by, En banc *Smyer v. Kroger Ltd. P'ship I, 2024 U.S. App. LEXIS 9156 (6th Cir., Apr. 15, 2024)*

**Prior History: [*1]** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO.

*Smyer v. Kroger Ltd. P'ship I, 2022 U.S. Dist. LEXIS 125389, 2022 WL 2757655 (S.D. Ohio, July 14, 2022)*

## Core Terms

termination, notice, fired, summary judgment, discriminate, sex, district court, disability, stepdaughter, promotion, color, court's decision, prima facie case, national origin, store manager, retaliation, religion, reasons, rights, employment discrimination, disciplinary, demographic, intervening, employees, tasks

## Case Summary

**Overview**

HOLDINGS: [1]-Regarding the employee's claim of reverse race discrimination, he failed to provide evidence that he was treated worse than comparable persons of a different race because the record showed that the six black managers who received severance packages were not fired for cause as he was. The employee claimed that three of those managers were fired for cause but he offered no evidence of same except his own affidavit; [2]-No reasonable jury could have concluded that the employee at any point provided adequate notice of his need for FMLA leave because the record did not support that the instances cited by the employee constituted adequate notice. The employee did not show evidence that he actually referenced the need to care for his stepdaughter in any of his alleged requests for leave.

**Outcome**
Judgment affirmed.

## LexisNexis® Headnotes

Labor & Employment Law > Discrimination > Reverse Discrimination

***HN1***[] **Discrimination, Reverse Discrimination**

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 45

All claims of race and sex discrimination are actionable under its terms. Title VII's terms are not limited to discrimination against members of any particular race. Title VII proscribes racial discrimination in private employment against whites on the same terms as racial discrimination against nonwhites. Simply put, the Act prohibits All racial discrimination in employment, without exception for any group of particular employees.

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > Cross Motions

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > Appeals > Standards of Review > De Novo Review

**HN2[⬇] Motions for Summary Judgment, Cross Motions**

An appellate court reviews de novo a district court's decision on summary judgment. When reviewing cross-motions for summary judgment, an appellate court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party. The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate. Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party shows that it is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

Labor & Employment Law > ... > Gender & Sex Discrimination > Employment Practices > Demotions & Promotions

Labor & Employment Law > Discrimination > Reverse Discrimination

Labor & Employment Law > ... > Employment Practices > Adverse Employment Actions > Demotions & Promotions

Labor & Employment Law > ... > Evidence > Burdens of Proof > Employee Burdens of Proof

Labor & Employment Law > ... > Racial Discrimination > Employment Practices > Demotions & Promotions

**HN3[⬇] Employment Practices, Demotions & Promotions**

The traditional framework for stating a prima facie case of race discrimination requires a plaintiff to establish, absent direct evidence of discriminatory intent, that: (1) he is a member of a protected class; (2) he was qualified for a promotion; (3) he was considered for and denied that promotion; and (4) other candidates with similar qualifications who were not members of the protected class received promotions when the plaintiff's request for promotion was denied. The United States Court of Appeals for the Sixth Circuit has modified this framework for reverse-discrimination claims filed by members of a demographic majority. In that circumstance, the plaintiff may only rely on the scheme to prove a prima facie case of discrimination if he

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 46



can show that his employer is that unusual employer who discriminates against the majority.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

Labor & Employment Law > Discrimination > Reverse Discrimination

Labor & Employment Law > ... > Evidence > Burdens of Proof > Employee Burdens of Proof

Labor & Employment Law > ... > Racial Discrimination > Evidence > Circumstantial & Direct Evidence

**HN4[⭳] Burdens of Proof, Burden Shifting**

For a claim of reverse race discrimination to proceed, the employee must provide some evidence that he was treated worse than comparable persons of a different race.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

Labor & Employment Law > Discrimination > Reverse Discrimination

Labor & Employment Law > ... > Evidence > Burdens of Proof > Employee Burdens of Proof

**HN5[⭳] Burdens of Proof, Burden Shifting**

To demonstrate pretext in the context of a reverse race discrimination claim in the workplace, an employee must show that the legitimate reasons (1) have no basis in fact, (2) did not actually motivate the employer's action, or (3) were insufficient to warrant the employer's action.

Labor & Employment Law > Leaves of Absence > Family & Medical Leaves > Burdens of Proof

Labor & Employment Law > Discrimination > Reverse Discrimination

**HN6[⭳] Family & Medical Leaves, Burdens of Proof**

In reverse race discrimination claims in the workplace, absent direct evidence of interference or retaliation, an employee must prove either FMLA theory under the framework. To establish a prima facie case of FMLA interference, the employee must show that (1) he was an eligible employee; (2) the employer meets the FMLA's definition of employer; (3) he was entitled to FMLA leave; (4) he gave the employer notice of his intention to take FMLA leave; and (5) the employer denied the employee the FMLA benefits to which he was entitled. For his retaliation claim, the employee must show that (1) he was engaged in an activity protected by the FMLA; (2) the employer knew that he was exercising his FMLA rights; (3) the employer, after learning that the employee was exercising these rights, took an adverse employment action; and (4) there was a causal connection between that adverse action and the protected FMLA activity. If the employee establishes his prima facie case, the burden shifts to the employer to show that it had a legitimate, nondiscriminatory reason for firing the employee. If the employer satisfies this burden, the burden shifts back to the employee to rebut the employer's reason as pretextual.

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 47

Labor & Employment Law > Leaves of Absence > Family & Medical Leaves > Burdens of Proof

HN7[] **Family & Medical Leaves, Burdens of Proof**

An employee need not expressly mention the FMLA when requesting leave. However, the FMLA does not require an employer to be clairvoyant. The employee must provide the employer enough information to know that an FMLA qualifying event has occurred.

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > Qualified Individuals With Disabilities

HN8[] **Scope & Definitions, Qualified Individuals With Disabilities**

To establish a prima facie case of disability discrimination, an employee must show that he: (1) is disabled; (2) is otherwise qualified to perform the essential functions of his job; and (3) suffered an adverse employment action because of his disability. For a perceived-disability discrimination claim, the employee need only show that the employer believed that he was disabled.

Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims

Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > Same Case & Controversy

HN9[] **Supplemental Jurisdiction, Pendent Claims**

A district court can exercise supplemental jurisdiction over all other claims that form part of the same case or controversy as the claim over which they have original jurisdiction, 28 U.S.C.S. § 1367(a), but doing so is discretionary. Once a federal court no longer has federal claims to resolve, it should not ordinarily reach the plaintiff's state-law claims.

**Counsel:** For MATTHEW SMYER, Plaintiff - Appellant: Peter Kevin Newman, The Newman Law Group, Dayton, OH.

For KROGER LIMITED PARTNERSHIP I, ERIC CURTIS, JESSICA UTTERBACK, PAM HARGIS, DUANE HATFIELD, Defendants - Appellees: Emily Jane Gelhaus, Defendant - Appellee, Jackson Lewis, Cincinnati, OH; Daniel Goodman Rosenthal, Jackson Lewis, Cincinnati, OH.

**Judges:** Before: SUTTON, Chief Judge; BOGGS and READLER, Circuit Judges. BOGGS, J., (pp. 14-18), and READLER, J. (pp. 19-21), delivered separate concurring opinions.

## Opinion

The court delivered a PER CURIAM opinion. BOGGS, J., (pp. 14-18), and READLER, J. (pp. 19-21), delivered separate concurring opinions.

PER CURIAM. This case involves a claim by Matthew Smyer, a white supervisor at several Kroger grocery stores, that he was discriminated against because of his race and sex. Kroger defended on the grounds that he had not shown that Kroger was "the unusual employer who discriminates against the majority" and because there were legitimate non-discriminatory reasons for the ills that he allegedly suffered. The district court ruled for Kroger, citing both grounds, and Smyer appeals. [*2] He also raises claims under the Family and Medical Leave Act (FMLA), which the district court correctly rejected below. We

affirm.

I

A

Matthew Smyer, a white male who managed several Kroger stores near Dayton, Ohio, was assigned in May 2016 to Kroger's store in Wilmington, Ohio. Approximately one year later, district manager Clint Rose—Smyer's direct supervisor—met with Smyer to discuss his performance. Employees at the Wilmington store had expressed their concerns about Smyer's management skills. Rose apparently agreed. He transferred Smyer to a smaller store on Bechtle Avenue in Springfield, Ohio, and warned Smyer that this position would be his "last chance" to prove himself as a manager.

Smyer's tenure in Springfield was fraught with problems. His assistant manager filed a complaint about Smyer's treatment of his employees. A corporate executive called the Bechtle Avenue meat department an "abomination." Several employees requested transfers away from Smyer's stores. Amid this continued turmoil, Rose again met with Smyer and repeated his warning that Smyer's status as a manager with Kroger was in jeopardy.

On October 15, 2019, a chicken fryer caught fire at the Bechtle Avenue store. **[*3]** Smyer was home at the time but learned from his assistant manager about the fire and the store's subsequent evacuation. When Eric Curtis—who had recently replaced Rose as Smyer's direct supervisor—called Smyer and asked if he was returning to the store, Smyer explained that he first had to finish mowing his lawn and attend to family obligations. Smyer would later explain that these obligations meant picking up his stepdaughter, whose medical condition keeps her from driving. Ten days after the fire, Smyer met with Duane Hatfield—the human-resources head of Kroger's Cincinnati and Dayton division—and two other HR representatives to discuss the fire and other issues with Smyer's performance. Hatfield transferred Smyer to the South Limestone Street store, an even smaller store than Kroger's Bechtle Avenue location. Smyer acknowledged in a disciplinary memo that this transfer was his "Last Chance and Final Warning," and that further violations of Kroger policy could result in his termination.

Kroger announced in January 2020 that it would close the South Limestone store. Smyer was instructed to prepare the store for closing by establishing clearance sections, cleaning shelves, and clearing **[*4]** the store's backroom. But when Curtis visited the store in February, he found that Smyer had neither completed these tasks nor communicated with his employees about them. Curtis issued Smyer a written warning that further incidents could lead to his termination.

Smyer disagreed with Curtis's evaluation. He claimed that Merle Hargis, a corporate employee who oversees Kroger's store closings, had visited the store and said that he "was very pleased with [its] performance" because Smyer and his team "were way beyond expectations." Upon learning of Smyer's comment, Hargis rejected it as "not a true statement." He explained that the shutdown tasks "should have been much further along or completed."

Over the next few weeks, HR representative Jessica Utterback repeatedly attempted to contact Smyer about other issues with the South Limestone store, but Smyer did not return her emails, texts, or phone calls. Utterback learned that Smyer had failed to complete various management tasks, including not posting employee vacation schedules on time and, despite her instructions, not completing a review of his assistant store manager. When Utterback visited the store on March 3, she found many shelves **[*5]** empty.

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 48

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 49

On March 4, Hatfield, Curtis, and Utterback agreed to terminate Smyer. Curtis and Utterback met with Smyer that afternoon to give him the chance to resign. Although the parties dispute what happened near the end of this meeting, they agree that Smyer asked Curtis to stop yelling at him and that Smyer said that he feared Curtis. Smyer did not resign.

Two days later, Hatfield, Curtis, and Utterback again met with Smyer to discuss his performance. After Curtis and Utterback left the room at Smyer's request, Smyer asked Hatfield for a referral to a counselor, citing emotional distress from his earlier confrontation with Curtis. This request did not sway Hatfield's decision on Smyer's employment status. On March 11, Hatfield fired Smyer.

B

Smyer then commenced this action against Kroger in the United States District Court for the Southern District of Ohio, alleging interference and retaliation under the FMLA, 29 U.S.C. § 2615(a)(1)-(2); "reverse" race discrimination and "reverse" sex discrimination,[1] in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a); discrimination for a perceived disability, in violation of Ohio Rev. Code § 4112.02(A); and claims brought under various Ohio common-law tort and contract causes of action. The parties filed cross-motions for summary judgment. [*6]

The district court granted summary judgment to Kroger and denied summary judgment to Smyer. The court rejected Smyer's claim of reverse race discrimination, holding that Smyer was not similarly situated to his chosen comparators—six Black store managers who were terminated as part of a Kroger reorganization but offered more generous severance packages. The court likewise rejected Smyer's claim of reverse sex discrimination, holding again that Smyer was not similarly situated to his chosen comparators—here, six female employees offered store-manager positions around the time that Smyer was fired—as to whose qualifications or disciplinary history Smyer had provided no information.

The court also rejected Smyer's FMLA interference and retaliation claims, finding no evidence that those involved in Smyer's termination knew, or should have known, that Smyer had requested FMLA leave on various occasions over the last few months to care for his stepdaughter. The court added that, even if Smyer's supervisors were on notice that Smyer had taken FMLA leave, Smyer could not show that Kroger's reason for firing him—his poor performance as store manager—was pretextual. The district court also [*7] dismissed Smyer's claim that he was fired because of a perceived mental disability. The court noted that Hatfield had decided to fire Smyer before learning that Smyer had sought mental-health treatment. Finally, the court dismissed Smyer's remaining state-law claims without prejudice. It declined to exercise supplemental jurisdiction for these claims after dismissing all of Smyer's federal claims over which it had original jurisdiction.

Smyer timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

[1] Smyer uses the term "reverse" discrimination, so we will follow his usage, though Title VII has no such qualifier. HN1[] All claims of race and sex discrimination are actionable under its terms. *See* McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 278-79, 96 S. Ct. 2574, 49 L. Ed. 2d 493 (1976) ("[Title VII's] terms are not limited to discrimination against members of any particular race."). As Justice Marshall wrote for a unanimous Court, Title VII "proscribe[s] racial discrimination in private employment against whites on the same terms as racial discrimination against nonwhites." *Id. at 280*. Simply put, "[t]he Act prohibits All racial discrimination in employment, without exception for any group of particular employees." *Id. at 283*.

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 50



II

HN2[] We review de novo a district court's decision on summary judgment. *Hrdlicka v. Gen. Motors, LLC, 63 F.4th 555, 566 (6th Cir. 2023)*. "When reviewing cross-motions for summary judgment, we must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc., 336 F.3d 503, 506 (6th Cir. 2003)*. "The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate." *Parks v. LaFace Records, 329 F.3d 437, 444 (6th Cir. 2003)*. Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party shows that it is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*. A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a [*8] verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

III

HN3[] The traditional *McDonnell Douglas* framework for stating a prima facie case of race discrimination requires a plaintiff to establish, absent direct evidence of discriminatory intent, that: (1) he is a member of a protected class; (2) he was qualified for a promotion; (3) he was considered for and denied that promotion; and (4) other candidates with similar qualifications who were not members of the protected class received promotions when the plaintiff's request for promotion was denied. *Nguyen v. City of Cleveland, 229 F.3d 559, 562-63 (6th Cir. 2000)*; *see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. Our circuit has modified this framework for reverse-discrimination claims filed by members of a demographic majority. In that circumstance, the plaintiff may only rely on the *McDonnell Douglas* scheme to prove a prima facie case of discrimination if he can show that his employer "is that unusual employer who discriminates against the majority." *Murray v. Thistledown Racing Club, Inc., 770 F.2d 63, 67 (6th Cir. 1985)* (quoting *Parker v. Baltimore & O. R. Co., 652 F.2d 1012, 1017, 209 U.S. App. D.C. 215 (D.C. Cir. 1981)*).

We start with Smyer's claim of reverse race discrimination. HN4[] For that claim to proceed, Smyer must provide some evidence that he was treated worse than comparable persons of a different race. *See, e.g.*, *Arendale v. City of Memphis, 519 F.3d 587, 603 (6th Cir. 2008)*. He failed to do so. Smyer argues that Kroger treated him less favorably under its severance policy than similarly situated Black store [*9] managers. He asserts that, of the twenty store managers in Smyer's division who were offered severance packages around the time of Smyer's termination, six were Black and received severance packages more favorable than Kroger's two-month offer in his case. But the record does not support these allegations. The six Black managers received severance packages under Kroger's Reorganization Severance Plan, for which Smyer was not eligible upon termination because he was fired for cause. Smyer claims that three of these managers were fired for cause but offers no evidence except his own affidavit. On the contrary, the record is clear that these managers were not fired for cause.

In addition, Kroger presented legitimate non-discriminatory reasons for its decision to terminate Smyer. Kroger claims that it terminated Smyer for poor performance, poor leadership, and insubordination. The district court's analysis on that point was wholly correct. The record is replete with examples of Smyer's performance issues.

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 51

Nonetheless, Smyer argues that Kroger's explanation is pretextual. *HN5*[↑] To demonstrate pretext, Smyer must show that these legitimate reasons (1) have no basis in fact, (2) did not actually **[*10]** motivate Kroger's action, or (3) were insufficient to warrant Kroger's action. *Redlin v. Grosse Pointe Pub. Sch. Sys., 921 F.3d 599, 612 (6th Cir. 2019)* (quoting *Chen v. Dow Chem. Co., 580 F.3d 394, 400 (6th Cir. 2009)*). Smyer contends that Kroger terminated Smyer not for his "long history of performance problems," but for his performance during the five months between the chicken-fryer fire and his termination. Even if Smyer's theory were correct, his performance at the South Limestone store does not undermine Kroger's explanation for his termination. Curtis issued Smyer a warning notice for his failure to complete shutdown tasks at the store. Hargis confirmed Smyer's lack of progress on those tasks. Utterback's subsequent visits revealed further instances of Smyer's poor leadership and insubordination. Smyer claims that Kroger has offered inconsistent explanations for his termination, but the record charts a steady series of performance problems throughout Smyer's tenure as a manager. Smyer has not shown pretext.

For similar reasons, Smyer's claim of reverse sex discrimination also fails. He claims that Kroger promoted several less-experienced women to store managers around the time that it terminated Smyer. Smyer was not eligible for a promotion or transfer because of his disciplinary history. Although Smyer **[*11]** concedes that he has no evidence about the women's job performance or disciplinary history, he stresses that Hatfield also knew nothing about the women when he promoted them. Regardless of what Hatfield may have known about Smyer's chosen comparators, Smyer has not presented evidence of a store manager with a performance record as poor as his. Without any evidence of his comparators' disciplinary history or performance, Smyer fails to establish that these women were similarly situated to him. *See, e.g., Simpson v. Vanderbilt Univ., 359 F. App'x 562, 569 (6th Cir. 2009)*.

IV

We next turn to Smyer's FMLA claims. Smyer attempts to show that Kroger violated his FMLA rights under two theories: interference and retaliation. *See Dyer v. Ventra Sandusky, LLC, 934 F.3d 472, 475 (6th Cir. 2019)*. The interference theory, which arises under *29 U.S.C. § 2615(a)(1)*, prohibits Kroger from "interfer[ing] with or deny[ing]" Smyer's exercise of his FMLA rights. *Bryson v. Regis Corp., 498 F.3d 561, 570 (6th Cir. 2007)*. The retaliation theory, which arises under *29 U.S.C. § 2615(a)(2)*, bars Kroger from "discharging or discriminating" against Smyer "for 'opposing any practice made unlawful by'" the FMLA. *Ibid.* (quoting *Arban v. W. Publ'g Corp., 345 F.3d 390, 400-01 (6th Cir. 2003)*).

*HN6*[↑] Absent direct evidence of interference or retaliation, Smyer must prove either FMLA theory under the *McDonnell Douglas* framework. *See Demyanovich v. Cadon Plating & Coatings, L.L.C., 747 F.3d 419, 427, 432-33 (6th Cir. 2014)*; *Romans v. Mich. Dep't of Hum. Servs., 668 F.3d 826, 840, 842 (6th Cir. 2012)*. To establish a prima facie case of FMLA interference, Smyer must show that (1) he was an eligible **[*12]** employee; (2) Kroger meets the FMLA's definition of "employer"; (3) he was entitled to FMLA leave; (4) he gave Kroger notice of his intention to take FMLA leave; and (5) Kroger denied Smyer the FMLA benefits to which he was entitled. *Dyer, 934 F.3d at 475*. For his retaliation claim, Smyer must show that (1) he was engaged in an activity protected by the FMLA; (2) Kroger knew that he was exercising his FMLA rights; (3) Kroger, after learning that Smyer was exercising these rights, took an adverse

employment action; and (4) there was a causal connection between that adverse action and the protected FMLA activity. Donald v. Sybra, Inc., 667 F.3d 757, 761 (6th Cir. 2012). If Smyer establishes his prima facie case, the burden shifts to Kroger to show that it had "a legitimate, nondiscriminatory reason" for firing Smyer. *Ibid.* If Kroger satisfies this burden, the burden shifts back to Smyer to rebut Kroger's reason as pretextual. *Id. at 761-62*.

The parties dispute only whether the supervisors involved in Smyer's termination—Eric Curtis, Duane Hatfield, and Jessica Utterback—knew, or were on notice, that Smyer had asserted his FMLA rights. **HN7**[] Smyer need not expressly mention the FMLA when requesting leave. Brenneman v. MedCentral Health Sys., 366 F.3d 412, 421 (6th Cir. 2004). However, "[t]he FMLA does not require an employer to be clairvoyant." *Id. at 428*. Smyer **[*13]** must provide Kroger "enough information . . . to know that an FMLA qualifying event has occurred." Hrdlicka, 63 F.4th at 573.

Smyer identifies three instances when he contends that he adequately notified his supervisors that he was taking FMLA leave to drive his stepdaughter from school or to a medical procedure: (1) during the October 25, 2019, meeting about the chicken-fryer fire that took place on October 15; (2) on November 27, 2019, when he asked Curtis for a day off; and (3) on February 12, 2020, when he asked Curtis for another day off.

The record does not support that these instances constituted adequate notice. Notes taken during the October 25, 2019, meeting indicate that Smyer never told Hatfield that he was using FMLA leave to pick up his stepdaughter during the fire incident. They suggest only that Smyer mentioned "family obligations," and that he "had to pick [his] daughter up." When Hatfield asked Smyer whether he could have arranged alternative transportation for his stepdaughter instead of picking her up, Smyer acknowledged the point instead of explaining that his stepdaughter's condition prevents her from driving or that he had approval to take FMLA leave. Smyer's account of this meeting, to **[*14]** the extent that it has been consistent, rests only on his own pleadings. It is not supported by his testimony and conflicts with the picture painted by two sets of contemporaneous meeting notes and testimony from the three other people in the meeting. No reasonable jury could conclude that Smyer told Hatfield at this meeting that he was taking FMLA leave.

Smyer attempts to show notice through affidavits from himself and district manager Clint Rose. Smyer does not challenge—and therefore forfeits any objection to—the district court's decision to deny Smyer leave to file a revised memorandum in opposition to Kroger's motion for summary judgment, to which his affidavit was attached. *See Doe v. Mich. State Univ., 989 F.3d 418, 425 (6th Cir. 2021).* Meanwhile, Rose's affidavit, in which Rose states that he was aware that Smyer "had [been] approved [for] intermittent FMLA leave," proves only that Kroger had institutional knowledge of Smyer's FMLA status. *See* Slusher v. U.S. Postal Serv., 731 F. App'x 478, 480 (6th Cir. 2018). Smyer does not otherwise show that Rose told Smyer's supervisors about Smyer's FMLA status before they terminated him—or that Smyer ever put his supervisors on notice of a specific FMLA event. Nor has Smyer shown that Curtis or Utterback knew of his FMLA status. His suggestion that the panel **[*15]** can infer knowledge through "discriminatory information flow" fails because Smyer has not shown that Curtis or Utterback knew that he had ever taken FMLA leave. *See* Madden v. Chattanooga City Wide Serv. Dep't, 549 F.3d 666, 678 (6th Cir. 2008).

Smyer similarly offers no evidence other than



Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 52

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 53

his own deposition testimony to show that he requested FMLA leave from Curtis on the two days in November 2019 and February 2020. Smyer claims that the first exchange with Curtis happened via email, but he never produced the emails. On the second occasion, Smyer claims that he requested leave in front of witnesses, but he did not ask any of them during their depositions if they remembered this conversation. Since Curtis denies knowing of Smyer's FMLA status, Smyer cannot "offer[] only conspiratorial theories . . . [or] flights of fancy, speculations, hunches, intuitions, or rumors." *Mulhall v. Ashcroft, 287 F.3d 543, 552 (6th Cir. 2002)*. On appeal, Smyer points to Hatfield's concession that these exchanges, as Smyer described them during his deposition, would amount to sufficient notice. But Hatfield's answers to Smyer's hypotheticals have no bearing on what Smyer told Curtis, or on whether he otherwise gave adequate notice.

Smyer argues that *Render v. FCA US, LLC, 53 F.4th 905 (6th Cir. 2022)*, controls his FMLA claims, but that case is easily distinguished. There, we reversed **[*16]** a grant of summary judgment against an employee's FMLA claims, holding that he had given his employer adequate notice of his leave request. *Id. at 919, 921*. But the decisionmaker in *Render* admitted to knowing that the employee had claimed FMLA leave before she terminated him. *Id. at 921*. Here, all of Smyer's supervisors denied knowing that Smyer had requested FMLA leave before they terminated him. And to the extent that "[r]eferencing symptoms and language that is used in an employee's medical certification forms would be sufficient" notice for Smyer's interference claim, *id. at 917*, Smyer has not met his burden to show evidence that he actually referenced the need to care for his stepdaughter in any of his alleged requests for leave, *see Alexander v. CareSource, 576 F.3d 551, 558 (6th Cir. 2009)*. No reasonable jury could conclude that Smyer at any point provided adequate notice of his need for FMLA leave.

V

Finally, we turn to Smyer's claim, arising under Ohio law, that he was fired because of a perceived mental disability. Because Ohio's antidiscrimination statute tracks the Americans with Disabilities Act (ADA), we consider Smyer's state-law claim under our ADA caselaw. *Talley v. Fam. Dollar Stores of Ohio, Inc., 542 F.3d 1099, 1104 n.3 (6th Cir. 2008)*. **HN8**[↑] To establish a prima facie case of disability discrimination, Smyer must show that he: (1) is disabled; (2) is otherwise qualified to perform the **[*17]** essential functions of his job; and (3) suffered an adverse employment action because of his disability. *Demyanovich, 747 F.3d at 433* (citing *Talley, 542 F.3d at 1105*). For a perceived-disability discrimination claim, Smyer need only show that Kroger believed that he was disabled. *Babb v. Maryville Anesthesiologists P.C., 942 F.3d 308, 319 (6th Cir. 2019)*.

Smyer claims that Hatfield fired him because he believed that Smyer had a mental disability. Smyer argues that Hatfield decided to terminate him days after learning that Smyer sought mental-health treatment. However, Hatfield decided to terminate Smyer on March 4, 2020, before Smyer ever requested a referral to a counselor. Nothing Smyer said in his March 6 meeting with Hatfield would have changed Hatfield's mind. Smyer notes that when he complained to Hatfield of Curtis's behavior during an earlier meeting, Hatfield said that he "was at a loss at what to do." That Hatfield may not have known how best to handle this exchange between Smyer and Curtis does not suggest that he was undecided about firing Smyer. Nor does the timing of Smyer's termination on March 11, after he first met with a Kroger-sponsored counselor, undercut the conclusion that a termination

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 54



decision had already been made. No reasonable jury could find that Hatfield fired Smyer because he [*18] believed that Smyer was disabled.

VI

Smyer also challenges the district court's decision not to exercise supplemental jurisdiction over his state-law claims. HN9[↑] We review such a decision for abuse of discretion. Southard v. Newcomb Oil Co., LLC, 7 F.4th 451, 455 (6th Cir. 2021). A district court can exercise supplemental jurisdiction "over all other claims that . . . form part of the same case or controversy" as the claim over which they have original jurisdiction, 28 U.S.C. § 1367(a), but doing so is discretionary, Gamel v. City of Cincinnati, 625 F.3d 949, 951 (6th Cir. 2010). "Once a federal court no longer has federal claims to resolve, it 'should not ordinarily reach the plaintiff's state-law claims.'" Southard, 7 F.4th at 455 (quoting Moon v. Harrison Piping Supply, 465 F.3d 719, 728 (6th Cir. 2006)). Had the district court maintained supplemental jurisdiction, it would have resolved only the claims arising under Ohio law. The court did not abuse its discretion in declining to do so. Smyer's arguments on the merits of these claims do not upset this conclusion. Nor does his assertion that the district court erred in dismissing Smyer's federal claims.

VII

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

**Concur by:** BOGGS; CHAD A. READLER

## Concur

BOGGS, Circuit Judge, concurring. I write separately to emphasize that *Murray v. Thistledown Racing Club, 770 F.2d 63 (6th Cir. 1985)*, should be overruled. By requiring a "majority" plaintiff to show that his employer "is that unusual [*19] employer who discriminates against the majority," *id. at 67*, *Thistledown* engages in the very discrimination that it intended to prohibit. And regardless of whether the case was ever correct, it has now been significantly undermined by the Supreme Court's decision in *Students for Fair Admissions v. President & Fellows of Harvard College, 600 U.S. 181, 143 S. Ct. 2141, 216 L. Ed. 2d 857 (2023)*. The impact of this intervening authority was not raised in this case, but in a case where it is raised, it should be the final nail in *Thistledown*'s coffin.

Although some courts agree with *Thistledown* and apply the unusual-employer requirement, *see, e.g.*, *Parker v. Baltimore & O. R. Co., 652 F.2d 1012, 1017-18, 209 U.S. App. D.C. 215 (D.C. Cir. 1981)*, others disagree, *see, e.g.*, *Iadimarco v. Runyon, 190 F.3d 151, 163 (3d Cir. 1999)*; *Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1325 n.15 (11th Cir. 2011)*.[1] In particular, as then-Judge (later Chief Judge) McKee explained, the unusual-employer requirement is "irremediably vague and ill-defined." *Iadimarco, 190 F.3d at 161*. "Such a requirement does raise the bar for the prospective 'reverse discrimination' plaintiff, notwithstanding the denial of this limitation" by courts that have adopted the rule. *Id. at 162*. And that higher bar, *Iadimarco* concluded, could not be squared with Title VII's core inquiry of "whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." *Id. at 160* (quoting *Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978)*).

---

[1] My colleague Judge Kethledge has helpfully summarized this circuit split. *See* *Ames v. Ohio Dep't of Youth Servs., 87 F.4th 822, 827-28 (6th Cir. 2023)* (Kethledge, J., concurring) (collecting cases). Five circuits have added this additional element, two have explicitly rejected it, and five simply do not apply it. *Ibid.* It appears that the Federal Circuit is the only circuit not to opine on the issue.

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 55

In *Thistledown*, we reasoned that this additional showing was necessary to determine **[*20]** whether discrimination against a member of the majority had, in fact, occurred. *See* 770 F.2d at 67 (requiring plaintiff to show he was intentionally discriminated against "despite his majority status"). But since 1985, the basis for *Thistledown* has become problematic. The very question of who should be considered part of the "majority" is increasingly contested. *See* David E. Bernstein, The Modern American Law of Race, 94 S. Cal. L. Rev. 171, 196-209 (2021); Students for Fair Admissions, 600 U.S. at 290-94 (Gorsuch, J., concurring). In addition, a wide variety of programs, especially in education, reveal that it is not at all unusual for major segments of society to base their actions on a person's membership in certain demographic groups, often to the detriment of the "majority" and certain "minority" persons sometimes deemed to be "majority-adjacent." The Supreme Court recently confronted this very issue in *Students for Fair Admissions*, holding that the admissions policies at Harvard College and the University of North Carolina violated the Equal Protection Clause of the Fourteenth Amendment. 600 U.S. at 230-31. In that case, self-proclaimed "Major American Business Enterprises"[2] filed a vehement amicus brief in support of that very discrimination. *See* Brief of Amici Curiae Supporting Respondents at 20-21, 600 U.S. 181, 143 S. Ct. 2141, 216 L. Ed. 2d 857 (2023) ("Prohibiting universities nationwide from considering race among other factors in composing student bodies would undermine businesses' efforts to build **[*21]** diverse workforces."); *see also* Brief for the American Bar Association as Amicus Curiae in Support of Respondents, 600 U.S. 181, 143 S. Ct. 2141, 216 L. Ed. 2d 857 (2023); Brief for Amici Curiae Association of American Medical Colleges et al. in Support of Respondents, 600 U.S. 181, 143 S. Ct. 2141, 216 L. Ed. 2d 857 (2023). These are difficult and more recent developments. But *Thistledown* itself is the only reason that we must confront them when attempting to resolve a reverse-discrimination claim. With no reference to statutory text, *Thistledown* distinguished plaintiffs based on their membership in certain demographic groups. In a world where it has become increasingly difficult to determine who belongs in the majority, it is more apparent than ever that *Thistledown* and its progeny have led our court's Title VII jurisprudence astray.

Even a simple textual interpretation of the Civil Rights Act shows *Thistledown*'s error, as my colleague Judge Kethledge has persuasively pointed out. *See* Ames, 87 F.4th at 827 (Kethledge, J., concurring). Title VII of the Act prohibits employment discrimination against "any individual . . . because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). This provision is not ambiguous: "any individual" means *any* individual, regardless of his or her demographic characteristics. It does not matter whether an individual possesses certain characteristics of race, color, religion, sex, or national origin. All people are equally entitled to be free from employment **[*22]** discrimination on those bases. It would be odd—contrary, even, to Title VII's important purpose of ensuring "that the workplace be an environment free of discrimination," Ricci v. DeStefano, 557 U.S. 557, 580, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009)—to subject a plaintiff to a more demanding burden simply based on his membership in a certain demographic group. To conclude otherwise would be to discriminate on "the very grounds

[2] Indeed, the signers of the brief included such corporations—taken at random and listed alphabetically—as American Express, Apple, Dell Technologies, General Electric, General Motors, Google, Merck & Co, Northrop Grumman, Procter & Gamble, United Airlines, and Walgreens. *See* Brief of Amici Curiae Supporting Respondents at app. A, 600 U.S. 181, 143 S. Ct. 2141, 216 L. Ed. 2d 857 (2023).

that the statute forbids." *Ames, 87 F.4th at 827* (Kethledge, J., concurring). And yet that is what *Thistledown* requires us to do.

*Students for Fair Admissions* significantly undermined this requirement. The case's impact was not raised here. But in a case where the issue is adequately briefed, there are strong reasons to conclude that a future panel should overrule *Thistledown*. In most cases, a panel cannot reconsider or alter circuit precedent without an en banc hearing. But when an intervening Supreme Court decision undermines our circuit precedent, we have the right—and the responsibility—to revisit our prior holdings. *See, e.g., United States v. Woods, 61 F.4th 471, 480 (6th Cir. 2023)*; *United States ex rel. Rahimi v. Rite Aid Corp., 3 F.4th 813, 829 (6th Cir. 2021)*; *Ne. Ohio Coal. for the Homeless v. Husted, 831 F.3d 686, 720-21 (6th Cir. 2016)*; *Sierra Club v. Korleski, 681 F.3d 342, 351-52 (6th Cir. 2012)*; *Barr v. Lafon, 538 F.3d 554, 570-71 (6th Cir. 2008)*. This is true "even when the intervening Supreme Court decision is not precisely on point but provides directly applicable legal reasoning, or when it provides on-point dictum." *United States v. Fields, 53 F.4th 1027, 1047 (6th Cir. 2022)* (cleaned up); *see also In re Baker, 791 F.3d 677, 682-83 (6th Cir. 2015)*; *Primax Recoveries, Inc. v. Gunter, 433 F.3d 515, 518-19 (6th Cir. 2006)*; *Prod. Solutions Int'l, Inc. v. Aldez Containers, LLC, 46 F.4th 454, 458 (6th Cir. 2022)*. To the extent **[*23]** that our circuit precedent conflicts with intervening Supreme Court authority, it is no longer controlling. *See United States v. Butts, 40 F.4th 766, 769 n.3 (6th Cir. 2022)*.

*Students for Fair Admissions* is such an intervening authority. *Thistledown*'s key premise was that discrimination against the majority was unusual and that to tease it out requires additional evidence. But *Students for Fair Admissions* shows that it is not unusual at all for powerful interests in the United States to indeed discriminate against the "majority." The Court repeatedly, and in no uncertain terms, characterized the universities' admissions practices as impermissible discrimination. *See, e.g., 600 U.S. at 205-11, 214*; *see also id. at 232* (Thomas, J., concurring) ("Two discriminatory wrongs cannot make a right."); *id.* at 288 (Gorsuch, J., concurring) ("[T]he trial records reveal that both schools routinely discriminate on the basis of race when choosing new students . . . ."). This reasoning plainly confirms that, contrary to *Thistledown*, discrimination against the "majority" occurs in ways and places that are not at all "unusual." It matters little that *Students for Fair Admissions* discussed this discrimination in the context of the *Fourteenth Amendment*—"'[b]oth Title VI and Title VII' codify a categorical rule of **[*24]** 'individual equality, without regard to race.'" *Id.* at 290 (Gorsuch, J., concurring) (quoting *Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 416 n.19, 98 S. Ct. 2733, 57 L. Ed. 2d 750 (1978)* (Stevens, J., concurring in judgment in part and dissenting in part)). Especially after *Students for Fair Admissions*, we cannot allow our precedent in *Thistledown* to resist the inevitable conclusion that "[e]liminating racial discrimination means eliminating all of it." *Id. at 206*.

All individuals who believe that they have been victims of any form of employment discrimination based on race, color, religion, sex, or national origin are entitled, on equal footing, to the protections afforded by Title VII. To accord our law with this core principle made explicit in *Students for Fair Admissions*, we should not apply *Thistledown*. Instead, we should use the conventional *McDonnell Douglas* framework to determine what a plaintiff—any plaintiff—is required to show to make a prima facie case of employment discrimination, just as seven of our sister circuits do. *See Iadimarco, 190 F.3d at 157-63*; *Smith, 644 F.3d at 1325 n.15*; *Williams v. Raytheon Co., 220 F.3d 16, 18-19 (1st Cir.*



Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 56

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 57

2000); Aulicino v. N.Y.C. Dep't of Homeless Servs., 580 F.3d 73, 80-81 & n.5 (2d Cir. 2009); Lightner v. City of Wilmington, 545 F.3d 260, 264-65 (4th Cir. 2008); Byers v. Dallas Morning News, Inc., 209 F.3d 419, 426 (5th Cir. 2000); Hawn v. Exec. Jet Mgmt., Inc., 615 F.3d 1151, 1156 (9th Cir. 2010).

CHAD A. READLER, Circuit Judge, concurring. I share Judge Boggs's dim view of Murray v. Thistledown Racing Club, Inc., 770 F.2d 63 (6th Cir. 1985). *See supra* at 14 (Boggs, J., concurring). It is no understatement to say, as a nation, that we do not all see eye to eye on issues of race, sex, religion, and **[*25]** the like. American history is replete with examples. As history has also made clear, harmonizing those differences is no easy task. Not for society. Not for lawmakers. And, I would add, not for the courts, as *Thistledown* reflects. Judge Kethledge brought the decision's deep flaws to light in his concurring opinion in Ames v. Ohio Dep't of Youth Servs., 87 F.4th 822, 827 (6th Cir. 2023) (Kethledge, J., concurring) (noting that "Title VII of the Civil Rights Act of 1964 bars employment discrimination against 'any individual'" but "our interpretation treats some 'individuals' worse than others" (citing, inter alia, *Thistledown*)). *Thistledown* was likely a good faith effort to address societal concerns perceived by the Court. But as Judge Boggs explains, as a textual matter, *Thistledown* was wrong the moment it was decided. Time has only confirmed that conclusion. *See* Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 204-08, 214, 143 S. Ct. 2141, 216 L. Ed. 2d 857 (2023); *supra* at 14-16 (Boggs, J., concurring).

Last year, *Students for Fair Admissions* struck down race-based admissions policies that purported to preference "minority" applicants. *Students for Fair Admissions*, 600 U.S. at 218-19, 230. The Supreme Court's command was unambiguous: "race may never be used as a 'negative.'" *Id.* at 218. As a result, admissions policies that "favor[ed] certain candidates over others based on the color of their skin" ran afoul of the law. *Id.* at 301 (Thomas, J., concurring). That **[*26]** was true as a constitutional matter—in the case of the University of North Carolina, the practice violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 230 (majority opinion). And it was also true as a statutory matter—in the case of Harvard University, the practice violated Title VI of the Civil Rights Act of 1964. *Id.* at 198 n.2, 230.

That latter holding, which "restored the plain text of Title VI," bears emphasis here. Hamilton v. Dallas Cnty., 79 F.4th 494, 508 (5th Cir. 2023) (en banc) (Ho, J., concurring). True, today's case is pursued under Title VII, not Title VI. But the two hold much in common. Congress enacted Title VI and Title VII simultaneously in the Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241. And each is a reflection of the other. With respect to a "program or activity receiving Federal financial assistance," Title VI mandates that "[n]o person in the United States shall, on the ground of race, color, or national origin, . . . be subjected to discrimination." 42 U.S.C. § 2000d. "Just next door," Justice Gorsuch observed in *Students for Fair Admissions*, "Congress made it 'unlawful . . . for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin.'" 600 U.S. at 290 (Gorsuch, J., concurring) (quoting 42 U.S.C. § 2000e-2(a)(1)). To his eye, the relevant text is "essentially identical." *Id.* To our eye as **[*27]** well, we recently noted. *See* L. W. by & through Williams v. Skrmetti, 83 F.4th 460, 484 (6th Cir. 2023) (citing Justice Gorsuch's concurrence in *Students for Fair Admissions* for the proposition that "Title VI and Title VII's terms are 'essentially identical'").

It follows that *Students for Fair Admissions*'s reading of Title VI is powerful evidence of the meaning of Title VII. As an interpretive matter, "when Congress uses the same terms in the same statute, we should presume they 'have the same meaning'" *Students for Fair Admissions, 600 U.S. at 290* (Gorsuch, J., concurring) (citing *IBP, Inc. v. Alvarez, 546 U.S. 21, 34, 126 S. Ct. 514, 163 L. Ed. 2d 288 (2005)*). That adage rings especially true here, where "'both Title VI and Title VII' codify a categorical rule of 'individual equality, without regard to race.'" *Id.* (quoting *Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 416 n.19, 98 S. Ct. 2733, 57 L. Ed. 2d 750 (1978)* (Stevens, J., concurring in the judgment and dissenting in part)) (cleaned up). In the end, with *Students for Fair Admissions* seemingly prohibiting all forms of discrimination identified by Title VI, whether the victim is a member of a purported majority group or minority group, the same rule should apply to cases brought under Title VII, contrary to *Thistledown.*

As Judge Boggs emphasizes, however, we were not asked to consider *Students for Fair Admissions*'s effect on *Thistledown* and our Title VII jurisprudence. Nor, it appears, was there any mention of the **[*28]** issue in *Ames.* So whether *Thistledown* has continued viability after *Students for Fair Admissions* remains an open question in our circuit. But it is one ripe for consideration. And the holding there, informed by text and history, strongly suggests that *Thistledown*'s days are numbered.

---

**End of Document**

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 59

Tab "D"

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 60

Neutral
As of: December 3, 2024 3:26 PM Z

# Smyer v. Kroger Ltd. P'ship I

United States Court of Appeals for the Sixth Circuit

April 15, 2024, Filed

No. 22-3692

**Reporter**

2024 U.S. App. LEXIS 9156 *

MATTHEW SMYER, Plaintiff-Appellant, v. KROGER LIMITED PARTNERSHIP I, ET AL., Defendants-Appellees.

**Prior History:** *Smyer v. Kroger Ltd.. P'ship I, 2024 U.S. App. LEXIS 5717, 2024 FED App. 107N (6th Cir.), 2024 WL 1007116 (6th Cir. Ohio, Mar. 8, 2024)*

## Core Terms

petition for rehearing, en banc

**Counsel:** **[*1]** For MATTHEW SMYER, Plaintiff - Appellant: Peter Kevin Newman, The Newman Law Group, Dayton, OH.

For KROGER LIMITED PARTNERSHIP I, ERIC CURTIS, JESSICA UTTERBACK, PAM HARGIS, DUANE HATFIELD, Defendants - Appellees: Emily Jane Gelhaus, Daniel Goodman Rosenthal, Jackson Lewis, Cincinnati, OH.

**Judges:** BEFORE: SUTTON, Chief Judge; BOGGS and READLER, Circuit Judges.

## Opinion

ORDER

The court received a petition for rehearing en banc. The original panel has reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission and decision of the case. The petition then was circulated to the full court. No judge has requested a vote on the suggestion for rehearing en banc.

Therefore, the petition is denied.

End of Document

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 61

Tab "E"

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 62

Ⓐ Neutral
As of: December 3, 2024 3:28 PM Z

# *Ames v. Ohio Dep't of Youth Servs.*

Supreme Court of the United States

October 4, 2024, Decided

No. 23-1039.

**Reporter**

2024 U.S. LEXIS 3065 *; 93 U.S.L.W. 3070; __ S.Ct. __; 2024 WL 4394128

Marlean A. Ames, Petitioner v. Ohio Department of Youth Services.

**Prior History:** *Ames v. Ohio Dep't of Youth Servs., 87 F.4th 822, 2023 U.S. App. LEXIS 31902, 2023 WL 8368645 (6th Cir. Ohio, Dec. 4, 2023)*

**Judges: [*1]** Roberts, Thomas, Alito, Sotomayor, Kagan, Gorsuch, Kavanaugh, Barrett, Jackson.

## Opinion

Petition for writ of certiorari to the United States Court of Appeals for the Sixth Circuit granted.

---

**End of Document**

Tab "F"

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 64

Positive
As of: December 3, 2024 3:29 PM Z

# *Milner v. Biggs*

United States Court of Appeals for the Sixth Circuit

April 1, 2013, Filed

File Name: 13a0318n.06

No. 12-3526

**Reporter**

522 Fed. Appx. 287 *; 2013 U.S. App. LEXIS 6754 **; 2013 FED App. 0318N (6th Cir.); 2013 WL 1286068

JASON MILNER et al., Plaintiffs-Appellants, v. ROBIN BIGGS et al., Defendants-Appellees.

**Notice:** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. *SIXTH CIRCUIT RULE 28* LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE *RULE 28* BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**Prior History:** **[**1]** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO.

*Milner v. Biggs, 2012 U.S. Dist. LEXIS 48824 (S.D. Ohio, Apr. 6, 2012)*

## Core Terms

district court, inspection, grant summary judgment, real-estate, crawl space, fraudulent, misrepresentation, documents, pleadings, deed, consumer, negligent misrepresentation, motion for judgment, inspection report, genuine dispute, Confirmation, conspiracy, certification, summary judgment, remaining claim, no evidence, real estate, negligent-misrepresentation, misrepresented, recommending, concealment, collateral, Quitclaim, damages, seller

## Case Summary

### Procedural Posture

Appellant home buyers, who brought state and federal claims against appellees, the seller, a home inspector, the seller's real estate agency, the buyers' own real estate agents, and the title company, appealed the judgment of the United States District Court for the Southern District of Ohio that dismissed several claims in response to two motions for judgment on the pleadings and granted summary judgment to all appellees on the remaining claims.

### Overview

The court held that the district court properly granted the motions for judgment on the pleadings to the title company and the real estate agents as to the buyers' claims under the Ohio Consumer Sales Practices Act (OCSPA), *Ohio Rev. Code Ann. § 1345.01 et seq.* The buyers' allegations described collateral services solely associated with the sale of real estate, which was a pure real estate transaction, and the OCSPA had no application in a pure real estate transaction under *Ohio Rev. Code Ann. § 1345.01(A)*. The seller was properly granted summary judgment

Chris Chekan

because there was no genuine dispute that the buyers did not justifiably rely on a misrepresentation about the presence of mold in the seller's home, and the buyers also offered no evidence that the seller knew of the moisture damage or that she failed to exercise reasonable care by taking the word of a certified home inspector. The inspector was properly granted summary judgment because the buyers could not claim that the inspector misrepresented, either fraudulently or negligently, his credentials. It was also not a negligent misrepresentation for the real estate agents to state that the inspector was certified.

**Outcome**
The judgment was affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Civil Procedure > Judgments > Pretrial Judgments > Judgment on Pleadings

***HN1***[⬇] **Standards of Review, De Novo Review**

An appellate court reviews a grant of judgment on the pleadings de novo, just as it would an order granting a motion to dismiss. In reviewing the motion, the appellate court must construe the complaint in the light most favorable to the plaintiffs, accept all of the complaint's factual allegations as true, and determine whether the plaintiffs undoubtedly can prove no set of facts in support of their claim that would entitle them to relief.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal Entitlement

***HN2***[⬇] **Entitlement as Matter of Law, Appropriateness**

With respect to summary judgment, an appellate court reviews a district court's decision de novo. Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*. When determining whether a genuine issue for trial exists, the appellate court accepts the facts as alleged by the nonmoving parties to be true, and draws reasonable inferences in their favor.

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Erie Doctrine

***HN3***[⬇] **Federal & State Interrelationships, Erie Doctrine**

The federal courts generally will not trouble their sister state courts every time an arguably unsettled question of state law comes across their desks. When federal courts see a reasonably clear and principled course, they



Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 65

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 66

will seek to follow it themselves.

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

Real Property Law > Purchase & Sale > General Overview

**HN4[] Deceptive & Unfair Trade Practices, State Regulation**

The Ohio Consumer Sales Practices Act (OCSPA), *Ohio Rev. Code Ann. § 1345.01 et seq.*, provides that no supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. *Ohio Rev. Code Ann. § 1345.02(A)* (2012). The OCSPA defines a consumer transaction as follows: Consumer transaction means a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things. *§ 1345.01(A)*. The Supreme Court of Ohio, in interpreting *§ 1345.01(A)*, has held that the OCSPA has no application in a pure real estate transaction. By contrast, it held the OCSPA does apply to the personal property or services portion of a mixed transaction when a real-estate transaction is inextricably intertwined with the transfer of personal property or services. In distinguishing pure and mixed transactions, the Ohio Court of Appeals has clarified that a collateral service solely associated with the sale of real estate is a pure real estate transaction.

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

**HN5[] Deceptive & Unfair Trade Practices, State Regulation**

Where no other deceptive acts are alleged in connection with the use of a fictitious business name, the mere failure to register does not violate the Ohio Consumer Sales Practices Act, *Ohio Rev. Code Ann. § 1345.01 et seq.*

Real Property Law > Purchase & Sale > Contracts of Sale > General Overview

Torts > ... > Fraud & Misrepresentation > Actual Fraud > Elements

**HN6[] Purchase & Sale, Contracts of Sale**

Ohio law establishes the following elements for torts of fraud: The elements of fraud or fraudulent misrepresentation or fraudulent concealment are (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) followed by justifiable reliance upon the representation or concealment by the other party, and (6) a resulting injury proximately caused by the reliance. The use of an as-is contract relieves a seller of any duty to disclose, though it does not provide a defense to fraudulent misrepresentations.

Torts > ... > Fraud & Misrepresentation > Negligent Misrepresentation > Elements

**HN7[] Negligent Misrepresentation, Elements**

The elements of negligent misrepresentation are as follows: One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

**HN8[] Entitlement as Matter of Law, Genuine Disputes**

Speculation, unsupported by facts in the record, is insufficient to create a genuine issue of material fact and falls short of what is required to survive summary judgment.

Torts > ... > Concerted Action > Civil Conspiracy > Elements

**HN9[] Civil Conspiracy, Elements**

To maintain a claim of civil conspiracy, there must be a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages. Moreover, an underlying unlawful act is required before a civil conspiracy claim can succeed.

Real Property Law > Purchase & Sale > General Overview

Torts > Malpractice & Professional Liability > Professional Services

**HN10[] Real Property Law, Purchase & Sale**

Ohio does not require home inspectors to be certified, either by the American Society of Home Inspectors or any other organization.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Mistake

**HN11[] Heightened Pleading Requirements, Fraud Claims**

A plaintiff must state with particularity the circumstances constituting fraud or mistake. *Fed. R. Civ. P. 9(b)*.

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

**HN12[] Deceptive & Unfair Trade Practices, State Regulation**

Failing to register a fictitious name constitutes a deceptive and unfair practice under the Ohio Consumer Sales Practices Act, *Ohio Rev. Code Ann. § 1345.01 et seq.*, only when used by the entity in connection with some effort to avoid its responsibilities to consumers.

Torts > ... > Fraud & Misrepresentation > Actual Fraud > Elements

**HN13[] Actual Fraud, Elements**



Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 67

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 68



Statements of puffery are not actionable under Ohio law. To be actionable, a misrepresentation generally must relate to an existing or pre-existing fact which is susceptible of knowledge. A statement of opinion or belief such as occurs in puffing generally cannot constitute a misrepresentation.

Torts > ... > Standards of Care > Special Care > Highly Skilled Professionals

Torts > Malpractice & Professional Liability > Professional Services

HN14[] **Special Care, Highly Skilled Professionals**

The duty of care for real-estate agents is established by *Ohio Rev. Code Ann. § 4735.62*.

**Counsel:** For JASON A. MILNER, NATASHA M. MILNER, LEXI MILNER, (minor child), Plaintiffs - Appellants: Jason Vern Shugart, Seif & Shugart, Waverly, OH.

ROBIN BIGGS, Defendant - Appellee, Pro se, Beaver, OH.

LARRY DEPUGH, dba Larry DePugh Realty, Defendant - Appellee, Pro se, Chillicothe, OH.

For LARRY DEPUGH, dba Larry DePugh Realty, Defendant - Appellee: Frank H. Scialdone, Mazanec, Raskin & Ryder, Cleveland, OH.

For ANGELA SHANKS, dba Realtec Real Estate, Defendant - Appellee: Michael S. Loughry, Edward M. Ryder, Jr., Frank H. Scialdone, Mazanec Raskin & Ryder, Columbus, OH.

For BRENDA DEPUGH, Defendant - Appellee: Michael S. Loughry, Edward M. Ryder, Jr., Mazanec Raskin & Ryder, Columbus, OH.

For ARROW TITLE AGENCY, LLC, JONATHAN HOLFINGER, CHRIS MOORE, Defendants - Appellees: Cynthia A. Lammert, Reminger Co., Toledo, OH; Holly Marie Wilson, Reminger, Cleveland, OH; Jason D. Winter, Janik, Cleveland, OH.

For FRANK ROBERTS, Defendant - Appellee: Thomas M. Spetnagel, Law Office, Chillicothe, OH.

**Judges:** Before: MOORE and STRANCH, Circuit Judges, and HOOD, District Judge.*

**Opinion by:** KAREN NELSON MOORE

## Opinion

**[*289] KAREN NELSON MOORE, Circuit Judge.** Jason and Natasha Milner ("the Milners") bought Robin Biggs's house. The house turned out to be a lemon; the Milners soon discovered mold in several rooms and moisture damage in the crawl space. The Milners brought state and federal claims against Biggs, the home inspector, the real-estate agency representing Biggs, the Milners' own real-estate agents, and the title company. The district court dismissed several claims in response to two motions for judgment on the pleadings, and granted summary judgment to all defendants on the remaining claims. We **AFFIRM** the district court's judgment with respect to all counts.

### [*290] I. BACKGROUND & PROCEDURE

In 2010, the Milners decided to buy a house. They conducted two cursory walkthroughs of Biggs's house with an agent from Realtec Real Estate ("Realtec"),[1] at which point the Milners

* The Honorable Joseph M. Hood, United States District Judge [**2] for the Eastern District of Kentucky, sitting by designation.

[1] The complaint identifies a number of defendants including

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 69

made an offer through Biggs's real-estate agent at Larry DePugh Realty ("DePugh Realty"). After several rounds of negotiations, Biggs and the Milners signed a contract on April 12, 2010 to sell the house "as-is." R. 1-4 (Purchase Contract) (Page ID #32-34). They **[**3]** later signed an addendum that states that "[t]he purchaser is satisfied with the condition of the property and purchaser has not in any way[] relied upon any representations of seller . . . or agents concerning the past or present existence of mold in or around the property." R. 111-3 (Mold Addendum) (Page ID #1646).

Before closing, the Milners wanted the home inspected. They asked Realtec for a recommendation; Realtec's agent told the Milners that Frank Roberts was a certified home inspector who had worked with Realtec before, and that Roberts was "the best." R. 70-1 (Natasha Milner Dep. at 37-39) (Page ID #597-98). Roberts received his certification through Inspection Training Associates ("ITA"), a home-inspection course out of Virginia; Roberts had not completed enough inspections to join the American Society of Home Inspectors ("ASHI"). R. 101 (Roberts Dep. at 8-9, 18) (Page ID **[**4]** #1160-61, 1163). Although Realtec's agent offered to provide the Milners with a list of additional home inspectors, they declined the list and hired Roberts. R. 70-1 (Natasha Milner Dep. at 38) (Page ID #598).

Roberts inspected the home. He testified to being unable to inspect thoroughly the crawl space because the space allowed only twenty inches of clearance, and because fallen ducts blocked access. R. 101 (Roberts Dep. at 31-36) (Page ID #1166-67). His report stated that the "crawl space is dry," but that the foundation was only partially visible, that it was "difficult to access [the] entire area," and that areas that were inaccessible were "not included in this inspection." R. 101-1 (Inspection Report at 1, 6) (Page ID #1191, 1197). Roberts included with his report a copy of ASHI's "Standards of Practice and Code of Ethics"; the document includes a disclaimer that "[d]istribution of this material is not an indication of ASHI membership." R. 83-2 (ASHI Standard of Practice at 2) (Page ID #862). The Milners did not review these materials until the closing on the house, though they did consult a one-page summary which mentioned that the ducts were disconnected, but otherwise said **[**5]** nothing about the crawl space. R. 70-1 (Natasha Milner Dep. at 187-89) (Page ID #635); *see* R. 101-1 (Inspection Report at G/N) (Page ID #1188). Before closing, Biggs had the ducts reattached, and other items on the summary were repaired; these changes are recorded in the purchase contract addenda.

The Milners closed on May 18, 2010. Arrow Title ("Arrow") prepared the deed, which identified Jason Milner as the owner. R. 30-1 (General Warranty Deed) (Page ID #337). However, the Milners intended for both of their names to appear on the deed. Arrow has since prepared and provided a quitclaim deed correcting the error, R. 146-2 (Quitclaim Offer Letter) (Page ID #2157-58), but the Milners have not filed this new document.

**[*291]** Shortly after moving in, the Milners noticed problems with the house. Jason Milner entered the crawl space and noted that the floor joists "[a]ppeared to be all rotted." R. 69-1 (Jason Milner Dep. at 79) (Page ID #571). The Milners also detected suspected mold in the bathroom, attic, storage room, and spare closet. A new home inspection confirmed that there was moisture in the crawl space, that certain joists had deteriorated, and that mold was likely present in the suspected

---

Realtec, Realtec's owner Angela Shanks, and the Milners' agent Brenda DePugh. Because the claims against these three defendants are, by this point, factually and legally indistinguishable, this opinion refers to all three by the shorthand "Realtec."

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 70

**[**6]** areas. R. 41-1 (Parker Inspection Report) (Page ID #378-418).

The Milners brought suit in the Court of Common Pleas for Pike County, Ohio. They alleged various causes of action—violations of the Ohio Consumer Sales Practices Act ("OCSPA"), violations of the federal Real Estate Settlement Procedures Acts ("RESPA"), negligence, negligent misrepresentation, breach of fiduciary duty, conspiracy, fraudulent concealment, fraudulent inducement, fraud, breach of contract, and unjust enrichment—against Biggs, Roberts, DePugh Realty, Realtec, and Arrow. R. 1-3 (Complaint) (Page ID #9-27). On the basis of the RESPA claims, the defendants successfully removed the case to the U.S. District Court for the Southern District of Ohio. On June 8, 2011, the district court granted Arrow's motion for judgment on the pleadings with respect to the OCSPA claim, which the Milners now appeal. See R. 48 (Op. & Order) (Page ID #439-51). On April 6, 2012, the district court granted Realtec's motion for judgment on the pleadings with respect to the OCSPA and conspiracy claims. R. 141 (Op. & Order at 16-18) (Page ID #2077-79). In the same order, it granted summary judgment to all defendants on all remaining claims. **[**7]** The Milners timely appealed.

## II. STANDARD OF REVIEW

The district court dismissed some claims brought by the Milners on motions for judgment on the pleadings brought under *Federal Rule of Procedure 12(c)*, and granted summary judgment on the remaining claims. ***HN1***[↑] We review a grant of judgment on the pleadings de novo, just as we would an order granting a motion to dismiss. *EEOC v. J.H. Routh Packing Co., 246 F.3d 850, 851 (6th Cir. 2001)*. "'In reviewing the motion, we must construe the complaint in the light most favorable to the plaintiff[s], accept all of the complaint's factual allegations as true, and determine whether the plaintiff[s] undoubtedly can prove no set of facts in support of [their] claim that would entitle [them] to relief.'" *Rawe v. Liberty Mut. Fire Ins. Co., 462 F.3d 521, 526 (6th Cir. 2006)* (quoting *Ziegler v. IBP Hog Market, Inc., 249 F.3d 509, 512 (6th Cir. 2001)*).

***HN2***[↑] With respect to summary judgment, we review the district court's decision de novo. *Med. Mut. of Ohio v. K. Amalia Enters. Inc., 548 F.3d 383, 389 (6th Cir. 2008)*. Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*. **[**8]** When determining whether a "genuine issue for trial" exists, we accept the facts as alleged by the Milners to be true, and draw reasonable inferences in their favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (citations omitted) (explaining *Fed. R. Civ. P. 56*)).

## III. JUDGMENT ON THE PLEADINGS

The district court granted Arrow's and Realtec's motions for judgment on the pleadings as to the Milners' OCSPA claims because it found that the parties did not participate in a "consumer transaction" covered by OCSPA. R. 48 (Op. & Order **[*292]** at 6-10) (Page ID #444-48) (Arrow); R. 141 (Op. & Order at 16-18) (Page ID #2077-79) (Realtec). The Milners now raise two central arguments. First, they claim that OCSPA does not exempt either title agencies or real-estate brokers; accordingly, the Milners argue that the district court erred in exempting these parties. Appellants' Br. at 19, 21. Second, they narrowly interpret OCSPA's exception for "pure real-estate transactions," *see Brown v. Liberty Clubs, Inc., 45 Ohio St.*

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 71

3d 191, 543 N.E.2d 783, 785 (Ohio 1989), as applying only to services that are required to transfer real property.[2] That is, the Milners argue that the services provided by **[**9]** real-estate agents and title agencies are merely "collateral to" the transfer of real property—property could exchange hands without the assistance of either a title agency or a broker—and therefore that the exception should not apply. *See* Mot. to Certify Questions of Law to the Supreme Ct. of Ohio at 14.

HN4[↑] OCSPA provides that "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction." *Ohio Rev. Code Ann. § 1345.02(A)* (West 2012). OCSPA defines a consumer transaction, with exceptions not applicable here, as follows:

> "Consumer transaction" means a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things.

*Ohio Rev. Code Ann. § 1345.01(A)*. The Supreme Court of Ohio, in interpreting *§ 1345.01(A)*, has held that OCSPA "has no application in a 'pure' real estate transaction." *Brown, 543 N.E.2d at 785*. By contrast, it held OCSPA does apply to "the personal property or services portion of a mixed transaction" when a real-estate transaction is "inextricably intertwined" with "the transfer of personal property or services." *Id. at 786* (concluding that using gifts to induce consumers to attend a real-estate sales pitch constitutes a mixed transaction). In distinguishing **[**11]** pure and mixed transactions, the Ohio Court of Appeals has clarified that "[a] collateral service solely associated with the sale of real estate is a pure real estate transaction." *Hurst v. Enter. Title Agency, Inc., 157 Ohio App. 3d 133, 2004 Ohio 2307, 809 N.E.2d 689, 697 (Ohio Ct. App. 2004)*.

With respect to Arrow, the Milners' complaint alleges that Arrow "fail[ed] to provide executed copies of all documents signed or initialed by Plaintiffs" and "failed to prepare the closing documents in accordance with the Purchase Contract." R. 1-3 (Complaint at ¶¶ 57, 59) (Page ID #15-16). Assuming these allegations are true, we conclude that they describe a pure real-estate transaction. The Milners acknowledge that Arrow assisted in preparing and filing "the documents pertinent **[*293]** to the transfer of the property" and "helped [the Milners] with the purchase documents at the time of the closing." Appellants' Br. at 20. And they have provided no explanation for how these services are anything but "collateral services solely associated with the sale of real estate." The Milners' observation that title could have passed without a title company's assistance is irrelevant to whether Arrow's services were collateral solely to the sale of **[**12]** Biggs's house. In holding that the services at issue are associated with a pure real-estate transaction and are therefore not covered by OCSPA, our conclusion sits comfortably with other decisions by Ohio courts interpreting OCSPA's real-estate exception. *See Heritage Hills, Ltd. v. Deacon,*

[2] The Milners argue that Ohio courts have extended OCSPA's real-estate exception beyond either the rule articulated by the Ohio Supreme Court in interpreting *Ohio Rev. Code Ann. § 1345.01*, *see Brown, 543 N.E.2d at 785*, or beyond the scope of *§ 1345.01* itself. Accordingly, they ask us to certify a question of law to the Ohio Supreme Court—although no specific question was provided—to determine whether Ohio courts have misapplied *Brown*, or whether *Brown* itself misconstrues *§ 1345.01*. HN3[↑] "[T]he federal courts generally will not trouble our sister state courts every time an arguably unsettled question of state law comes across our desks. When we see a reasonably clear and principled course, we will seek to follow it ourselves." *Pennington v. State Farm Mut. Auto. Ins. Co., 553 F.3d 447, 450 (6th Cir. 2009)* (internal quotation marks omitted). We are able to resolve the instant dispute through **[**10]** principled attention to clear Ohio law, and so we conclude that certification is unnecessary.

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 72

49 Ohio St. 3d 80, 551 N.E.2d 125, 128 (Ohio 1990) (excluding "residential lease transactions" from OCSPA); Hurst, 809 N.E.2d at 697 (excluding escrow services); Colburn v. Baier Realty & Auctioneers, No. 2002-T-0161, 2003 Ohio 6694, 2003 WL 22931379, at *4 (Ohio Ct. App. 2003) (unpublished opinion) (excluding services of a real-estate auctioneer); Rose v. Zaring Homes, Inc., 122 Ohio App. 3d 739, 702 N.E.2d 952, 957-58 (Ohio Ct. App. 1997) (holding that a contract to build a new home, but not the underlying property conveyance, is subject to OCSPA); Keiber v. Spicer Constr. Co., 85 Ohio App. 3d 391, 619 N.E.2d 1105, 1107-09 (Ohio Ct. App. 1993) (holding that a contract to build a new home is a "service," and so is a mixed transaction under OCSPA). Therefore, the district court properly granted judgment on the pleadings to Arrow with respect to the Milners' OCSPA claims.

The same conclusion applies to Realtec's services in this case. The Milners allege that Realtec **[**13]** violated OCSPA by "steering Plaintiffs to Defendant Arrow," "representing [that] Defendant Arrow would properly perform the required closing services," "representing that Defendant Roberts was certified at home inspections . . . and that Defendant Roberts would provide a competent home inspection," "representing [themselves] to be competent real estate agents," "failing to discuss with Plaintiffs the terms of the Purchase Contract, specifically the 'as-is' clause or recommending Plaintiffs seek legal counsel," "failing to provide executed copies of all documents signed or initialed by Plaintiffs," and "knowingly tak[ing] advantage of . . . Plaintiffs' inability to understand the numerous documents involved in a real estate transaction." R. 1-3 (Complaint at ¶¶ 54-61) (Page ID #15-16).[3] These allegations concern Realtec's involvement in recommending a title company and home inspector, and in preparing and providing documents associated with the ultimate sale. These activities are collateral to the sale of Biggs's house; Realtec was "merely acting as an intermediary to effectuate the sale of the real estate." *See* Hurst, 809 N.E.2d at 697. This case is unlike Brown, where goods unrelated **[**14]** to the underlying real property were used to induce consumers to consider and ultimately purchase real estate. The Milners decided to buy Biggs's home, and Realtec offered assistance directly related to completing that particular transaction. Accordingly, the district court was correct to **[*294]** grant Realtec's motion for judgment on the pleadings.

## IV. SUMMARY JUDGMENT

The Milners appeal several claims for which the district court granted summary judgment. We address those claims regarding each party.

### A. Biggs (Seller)

The district court granted summary judgment to Biggs on seven claims. R. 141 (Op. & Order **[**15]** at 8-12) (Page ID #2069-73). The Milners apparently contest three claims on appeal: fraud, fraudulent concealment, and civil conspiracy.[4] First, they claim that Biggs fraudulently misrepresented the condition of

[3] The Milners also allege that Realtec violated OCSPA by operating "without having registered [its] fictitious name with the Ohio Secretary of State." R. 1-3 (Complaint at ¶ 62) (Page ID #16). HN5[] "Where no other deceptive acts are alleged in connection with the use of a fictitious business name, the mere failure to register does not violate the [O]CSPA." Charvat v. Farmers Ins. Columbus, Inc., 178 Ohio App. 3d 118, 2008 Ohio 4353, 897 N.E.2d 167, 182 (Ohio Ct. App. 2008). Because the Milners do not allege anything besides the fact that the name "Realtec Real Estate" was not registered, this claim fails to state an OCSPA violation.

[4] Biggs appears to be proceeding pro se on appeal and has not filed a response brief.

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 73



her home. Appellants' Br. at 22. Second, because Jason Milner could observe the structural damage to the house, they claim this is evidence that Roberts never inspected the crawl space. *Id.* Third, they argue that the district court erred in finding that there was no evidence of malice sufficient to satisfy a conspiracy claim. *Id.* at 23. The district court, for its part, found that Biggs made no representations with respect to mold in the house, and was under no duty to disclose a latent defect when selling her house "as is." R. 141 (Op. & Order at 8-9) (Page ID #2069-70). It further found that, with respect to the crawl space, there was no evidence offered beyond speculation by Natasha Milner that Biggs fraudulently represented her awareness of the defect on the Residential Property Disclosure Form. *Id.* at 11 (Page ID #2072). Finally, because it found that Biggs lacked knowledge of the defects, the district court held that she could not have acted with malice in selling the **[**16]** house, nor had the Milners made any showing with respect to an agreement between the parties necessary to maintain the other elements of a civil-conspiracy claim. *Id.* at 12 (Page ID #2073).

HN6[↑] Ohio law establishes the following elements for torts of fraud:

> The elements of fraud or fraudulent misrepresentation [or fraudulent concealment] are (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) followed by justifiable reliance upon the representation or concealment by the other party, and (6) a resulting injury proximately caused by the reliance.

*Funk v. Durant, 155 Ohio App. 3d 99, 2003 Ohio 5591, 799 N.E.2d 221, 224 (Ohio Ct. App. 2003); see also Groob v. KeyBank, 108 Ohio St. 3d 348, 2006 Ohio 1189, 843 N.E.2d 1170, 1178 (Ohio 2006).*[5] The use of an as-is **[*295]** contract "relieve[s] a seller of any duty to disclose," though it "does **[**17]** not provide a defense to fraudulent misrepresentations." *Funk, 799 N.E.2d at 224.*

With respect to misrepresentations about mold, the only evidence identified is that Biggs stated on the Residential Property Disclosure **[**18]** Form that she had not performed a mold inspection. R. 1-4 (Property Disclosure Form at 2) (Page ID #29). That same form—signed by both parties—stated that "every home contains mold," and that it was the Milners' responsibility to have a mold inspection performed. *Id.* Later, the Milners signed a Mold Addendum that stated, among other things, that they "ha[d] not in any way[] relied upon any representations of seller . . . concerning the past or present existence of mold in or around the property." R. 111-3 (Mold Addendum) (Page ID #1646). Accordingly, there is no genuine dispute that

[5] The Milners' complaint alleges *negligent* misrepresentation, which the district court addressed. Their appeal, however, addresses fraudulent misrepresentation.

> HN7[↑] The elements of negligent misrepresentation are as follows: One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Delman v. City of Cleveland Heights, 41 Ohio St. 3d 1, 534 N.E.2d 835, 838 (Ohio 1989)* (internal quotation marks omitted) (emphasis omitted). Because the Milners could intend for their arguments about fraudulent misrepresentation to concern negligent misrepresentation, rather than fraud, we analyze their arguments under both fraud and negligence standards.

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 74

the Milners did not justifiably rely on a misrepresentation about the presence of mold in Biggs's home.

Biggs stated that she was unaware of water damage in the crawl space. R. 1-4 (Property Disclosure Form at 2) (Page ID #29). Natasha Milner averred that Biggs would have learned of the water damage when performing home repairs, although Natasha stated that "I'm speculating" in this conclusion. R. 70-1 (Natasha Milner Dep. at 148) (Page ID #625). HN8[↑] "Speculation, unsupported by facts in the record, is insufficient to create a genuine issue of material fact and falls short of what is required to survive summary **[**19]** judgment." Am. Rd. Serv. Co. v. Consol. Rail Corp., 348 F.3d 565, 569 (6th Cir. 2003). The Milners argue on appeal that the damage in the crawl space was so obvious to Jason Milner upon inspection that Roberts could not have conducted an investigation without seeing it. This argument does not create a genuine issue of material fact as to Biggs's knowledge for two reasons. First, Roberts and Jason Milner inspected the crawl space at different times: Roberts when the crawl space was obstructed by fallen ducts, and Jason Milner after the ducts were raised. Second, even assuming the damage was visible to Roberts, at issue is Biggs's knowledge. The Milners have offered no evidence that Biggs knew of the moisture damage, or that she failed to exercise reasonable care by taking the word of a certified home inspector. Accordingly, there is no genuine dispute as to whether Biggs knew or should have known that her representation about the water damage was inaccurate.[6]

HN9[↑] To maintain a claim of civil conspiracy, there must be "'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.'" Williams v. Aetna Fin. Co., 83 Ohio St. 3d 464, 1998 Ohio 294, 700 N.E.2d 859, 868 (Ohio 1998) (quoting Kenty v. Transamerica Premium Ins. Co., 72 Ohio St. 3d 415, 1995 Ohio 61, 650 N.E.2d 863, 866 (Ohio 1995)). "Moreover, '[a]n underlying unlawful act is required before a civil conspiracy claim can succeed.'" Chesher v. Neyer, 477 F.3d 784, 805 (6th Cir. 2007) (quoting Williams, 700 N.E.2d at 868). Insofar as the district court was correct to find that there was no genuine dispute that no underlying fraudulent conduct occurred, there is no basis to support a charge of civil conspiracy. Accordingly, **[*296]** the district court was correct to grant summary judgment to Biggs.

**B. Roberts (Home Inspector)**

The district court granted summary judgment to Roberts on six claims. R. 141 (Op. & Order at 25-27) (Page ID #2086-88). The Milners now appeal two claims: negligent misrepresentation and fraud. Appellants' Br. at 30-31. With respect to the **[**21]** negligent-misrepresentation claim, the district court found that Roberts had not misrepresented the fact that he was a certified home inspector. R. 141 (Op. & Order at 26) (Page ID #2087). Likewise, the district court found that Roberts did not misleadingly indicate affiliation with ASHI by including with his inspection reports ASHI documents, because those documents stated that "[d]istribution of this material is not an indication of ASHI Membership." Id. (quoting R. 83-2 (ASHI Standards of Practice at 2) (Page ID #862)). Finally, even assuming that the inclusion of ASHI materials amounted to a misrepresentation, the district court found that the Milners could not have relied on this

[6] For the same reasons, the district court was correct to grant summary judgment in favor of Biggs on the fraudulent-concealment claim. The Milners can identify no evidence that they justifiably relied on any statements by Biggs **[**20]** concerning mold, nor any evidence that Biggs knew of, and therefore could have concealed, evidence of moisture damage.

information, because the Milners admit that they did not read Roberts's inspection report before the closing. *Id.*

We first address Roberts's qualifications. The Milners do not deny that Roberts is an ITA-certified inspector. Instead, they reassert throughout their appeal that Roberts was not an ASHI-certified inspector.[7] However, they offer no argument as to why this fact—that Roberts is not a member of ASHI—would make it false to assert that Roberts was a certified home inspector. Although ASHI's standards **[**22]** are more exclusive, Roberts is nevertheless certified. *HN10*[↑] Ohio does not require home inspectors to be certified, either by ASHI or any other organization. The Milners did not inquire into Roberts's credentials, although Natasha Milner testified that she assumed an organization like ASHI exists to which Roberts belonged. This assumption alone is insufficient to render false Roberts's actual certification; there was no misrepresentation. Neither did Roberts misrepresent his qualifications by providing ASHI materials, because the materials themselves state that "[d]istribution of this material is not an indication of ASHI membership." R. 83-2 (ASHI Standard of Practice at 2) (Page ID #862). Even if this were a misrepresentation, the Milners admit that they did not look at the report—they viewed only a one-page summary—until after the deed was conveyed. R. 70-1 (Natasha Milner Dep. at 189-90) (Page ID #635-36). Thus, they could not have relied on the ASHI materials as an implied representation of Roberts's membership therein. The Milners cannot claim that Roberts misrepresented, either fraudulently or negligently, his credentials. Accordingly, the district court correctly found that there **[**23]** was no genuine dispute on this claim.

With respect to the inspection and inspection report, the district court found again that, because the Milners did not read Roberts's inspection report, there was no genuine dispute that they did not rely on it. R. 141 (Op. & Order at 26) (Page ID #2087). Moreover, the district court found that Roberts accurately described the house to the extent that he could inspect it, that his report made clear that he had not inspected inaccessible areas, and that any reliance on his limited inspection for more than was stated in the **[*297]** report was unreasonable as a matter of law. *Id.* at 26-27 (Page ID #2087-88). The Milners offer two arguments on appeal. First, they claim that they relied on the inspection report's one-page summary, which Roberts himself prepared. Appellants' Br. at 30-31. Second, they argue that there remains a genuine dispute as to whether a diligent home inspector would have discovered **[**24]** the moisture damage. *Id.* at 31.

To the extent that the Milners' theory of fraud argued on appeal concerns Roberts's inspection, it is inconsistent with the fraud alleged in their complaint. *HN11*[↑] A plaintiff "must state with particularity the circumstances constituting fraud or mistake." *Fed. R. Civ. P. 9(b)*. The Milners' complaint identifies as an instance of fraud only Roberts's "oral and written representations to Plaintiffs that he is a certified home inspector." R. 1-3 (Complaint at ¶ 145) (Page ID #22). The complaint does not allege that aspects of Roberts's inspection were fraudulent. Accordingly, there is no claim for us to review with respect to whether Roberts fraudulently performed his inspection. Thus, the district court was correct in granting summary judgment to Roberts on the entirety of the Milners' fraud claim.

[7] Roberts testified that his training with and certification by ITA qualifies him to join ASHI once he completes 250 inspections. R. 101 (Roberts Dep. at 18) (Page ID #1163). At the time, Roberts had completed approximately 80 inspections. *Id.* at 19 (Page ID #1163).



Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 75

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 76

**C. DePugh Realty (Seller's Agents)**

The district court granted summary judgment to DePugh Realty on seven claims. R. 141 (Op. & Order at 12-15) (Page ID #2073-76). On appeal, the Milners contest only the OCSPA claim. They argue that DePugh Realty violated OCSPA by operating under a fictitious name that had not been registered with the Secretary of State. Appellants' Br. **[**25]** at 23-24. As previously explained, *see supra* note 3, HN12[] failing to register a fictitious name constitutes "a deceptive and unfair practice [under OCSPA] only when used by the entity in connection with some effort to avoid its responsibilities to consumers." *Charvat v. Farmers Ins. Columbus, Inc., 178 Ohio App. 3d 118, 2008 Ohio 4353, 897 N.E.2d 167, 182 (Ohio Ct. App. 2008)*. The Milners have not alleged any deceptive acts tied to the use of the name DePugh Realty. Accordingly, the district court was correct to find that no genuine dispute existed.

**D. Realtec (Buyers' Agents)**

The district court granted summary judgment for Realtec on five claims, and in the same order it granted Realtec's motion for judgment on the pleadings with respect to the Milners' OCSPA and civil-conspiracy claims. R. 141 (Op. & Order at 18-24) (Page ID #2079-75). The OCSPA claim is addressed *supra* in Section III. With respect to the remaining claims, the Milners contest three on appeal: negligent misrepresentation, negligence, and breach of fiduciary duty. Appellants' Br. at 25-28. The district court dismissed the negligent-misrepresentation claim as it concerns Roberts because Realtec's agent did not misrepresent the truth when she said that Roberts **[**26]** was a certified home inspector. R. 141 (Op. & Order at 19) (Page ID #2080). In addition, the district court found that a statement that Roberts was "the best" when it came to home inspection was not actionable through a negligent-misrepresentation claim because it amounted to puffery. *Id.* at 19-20 (Page ID #2080-81). As to the negligence and fiduciary-duty claims, the district court found that, as a matter of law, Realtec acted according to the standard of care applicable to real-estate brokers. In particular, it found that Realtec did not breach any duty by describing Roberts as a certified home inspector or by recommending Roberts when it also offered the Milners a list of other house inspectors. *Id.* at 21 (Page ID #2082).

**[*298]** On appeal the Milners offer several arguments. First, the Milners reiterate that Realtec's agent stated that Roberts was "the best," when in fact Roberts was incompetent. Appellants' Br. at 25. Second, the Milners argue that there is no standard of care applicable to OCSPA violations.[8] *Id.* at 25-26. Third, assuming there is a standard of care, the Milners argue that Realtec's agent failed to satisfy that standard by stating that Roberts was certified without having **[**27]** previously required Roberts to produce documentation confirming his home-inspection training. *Id.* at 26.

With respect to negligent misrepresentation, the district court correctly noted that HN13[] statements of puffery are not actionable under Ohio law. *Kondrat v. Morris, 118 Ohio App. 3d 198, 692 N.E.2d 246, 251-52 (Ohio Ct. App. 1997)* ("To be actionable, a misrepresentation generally must relate to an existing or pre-existing fact which is susceptible of knowledge. A statement of opinion or belief such as occurs in 'puffing' generally cannot constitute a misrepresentation.") (internal citations omitted); *accord Davis v. Byers*

---

[8] This argument confuses the district court's analysis of negligence and breach of fiduciary duty with its analysis of OCSPA. The OCSPA claim is addressed *supra* in Section III.

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 77

Volvo, No. 11CA817, 2012 Ohio 882, 2012 WL 691757, at *8-9 (Ohio Ct. App. 2012). A statement that Roberts is "the best," then, does not give rise to a claim for negligent misrepresentation. Separately, and in light of the previous discussion of Roberts's certification, it was not a negligent misrepresentation for Realtec's agent to state that Roberts was certified.

With respect to negligence and breach of fiduciary duty, HN14[] the [**28] duty of care for real-estate agents is established by Ohio Rev. Code Ann. § 4735.62. Carpenter v. Long, 196 Ohio App. 3d 376, 2011 Ohio 5414, 963 N.E.2d 857, 877 (Ohio Ct. App. 2011). The Milners do not explain which aspect of this duty Realtec's agent violated when it recommended Roberts without having inspected Roberts's certification. Realtec had previously worked with Roberts and had not received any complaints about his performance. Moreover, Roberts was certified; consulting his certification would have confirmed what Realtec already, justifiably, believed to be true. The Milners have failed to explain why the failure to inspect personally Roberts's certification documents amounts to a breach of a broker's duty of care when the Realtec agent correctly identified that Roberts was certified. Accordingly, the district court was correct to grant summary judgment to Realtec.

**E. Arrow (Title Agency)**

In addition to the judgment-on-the-pleadings motions discussed above, the district court granted summary judgment to Arrow on two remaining claims: negligent misrepresentation and negligence. R. 141 (Op. & Order at 24-25) (Page ID #2085-86). The Milners appeal both. The district court granted summary judgment on the negligent-misrepresentation [**29] claim because it found that Arrow had never made a representation to the Milners—indeed, both Milners conceded as much—that its deed was correct. *Id.* at 24 (Page ID #2085). The district court granted summary judgment on the negligence claim because it found no evidence that Arrow had acted negligently when it prepared a title based on the order for title insurance. *Id.* at 25 (Page ID #2086). Moreover, even if Arrow had acted negligently, the district court found no evidence of damages; the Milners had never attempted to correct the inaccurate deed and had refused Arrow's offer to correct the deed free of cost. *Id.*; *see* R. 146-2 (Quitclaim [*299] Offer Letter) (Page ID #2157-58). The Milners offer two arguments on appeal. First, they argue that Arrow's filing a deed with the county clerk constitutes a representation. Appellants' Br. at 29. Second, the Milners argue that a plaintiff is not required to show damages as part of a successful OCSPA action. *Id.*

With respect to the Milners' second argument, they confuse their OCSPA claim, which we have already discussed, with a negligence action, for which proof of damages is a required element. Because the only damages that the Milners allege is an [**30] incorrect title, and because they do not contest that they have been provided a clean title but have refused to file it, *see* R. 146-2 (Quitclaim Offer Letter) (Page ID #2157-58), the Milners cannot establish injury from Arrow's purported negligence, and thus they cannot prevail on their negligence claim.

As to the negligent-misrepresentation claim, even if we were to accept that filing a deed with a county clerk could constitute a misrepresentation, other elements of a successful claim are nonetheless missing. In particular, Arrow's purported misrepresentation did not stem from a negligent performance of its duties. The Title Order Form is ambiguous as to who is to be listed as the buyer on the

title. R. 72-5 (Title Order Form) (Page ID #699). Thereafter, Arrow produced a Title Order Confirmation, which identified only Jason Milner as the buyer. R. 68-3 (Title Order Confirmation). The Milners did not object to the confirmation form. R. 70 (Natasha Milner Dep. at 96) (Page ID #612). The district court was correct to conclude that it was not negligent, as a matter of law, for Arrow to rely on this uncorrected confirmation form in producing a title. Moreover, the Milners cannot demonstrate **[**31]** a pecuniary loss from the mistake; they have refused Arrow's offer to be made whole. R. 146-2 (Quitclaim Offer Letter) (Page ID #2157-58). Summary judgment therefore was appropriate.

## V. CONCLUSION

For the reasons described above, we **AFFIRM** the judgment of the district court.

---

**End of Document**

Case: 24-1794 Document: 27 Filed: 01/15/2025 Page: 78